STATE, BY ITS ATTORNEY GENERAL, WARREN SPANNAUS, AND ANOTHER v.
COIN WHOLESALERS, INC., AND OTHERS.

250 N. W. 2d 583.

December 30, 1976—No. 46142.

*Hvass, Weisman & King* and *Russell Pannier,* for appellants.

*Warren Spannaus,* Attorney General, *Richard B. Allyn,* Solicitor General, *Thomas R. Muck,* Assistant Attorney General, and *Barry R. Greller,* Special Assistant Attorney General, for respondent.

*Howard Schneider,* General Counsel, *Richard E. Nathan,* Deputy General Counsel, and *Charles E. Hord,* Attorney, for

Commodity Futures Trading Commission, amicus curiae, seeking affirmance.

Considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

The State of Minnesota brought this action against defendants for alleged violations of state law in connection with their sale of United States silver coins on margin to the public. Defendants were specifically charged with the sale of unregistered securities; violation of the antifraud provisions of the Minnesota Securities Act, Minn. St. 1974, c. 80A; and violation of Minn. St. 1974, § 325.79 (consumer fraud), and Minn. St. 325.905 (false advertising). The relief sought included a declaratory judgment declaring defendants' margin sales to be the sale of securities, permanent injunctions to restrain violations of the above acts, an accounting of all funds received from Minnesota residents, and a $25,000 civil penalty authorized by Minn. St. 325.907, subd. 3. All of the requested relief was denied by the lower court with the exception of a declaration that the sale of silver coins on margin was the sale of an "investment contract" and hence a security within the meaning of Minn. St. 1974, § 80A.14(n). We uphold the trial court's determination that defendants' margin sales fall within our historically broad definition of an "investment contract" and affirm.

Dollar Shelter, Inc. (DSI), and Coin Wholesalers, Inc. (CWI), are both Minnesota corporations located at the same office in the IDS Center, Minneapolis, Minnesota. DSI is principally engaged in the business of selling silver coins to the public at retail. CWI does the vast majority of its business with DSI as a wholesaler of the silver coin investments sold by DSI. Both corporations are managed by defendant Merle Levitt. Levitt and defendant Bonnie Shapiro are, directly or indirectly, the sole shareholders of both corporations.

Most of DSI's sales are of pre-1965 United States silver coins which have a silver content of approximately 90 percent. These

coins, which are marketed in $1,000 bags, are sold primarily for their investment value and not for numismatic purposes. The purchase of silver coins is promoted by DSI as protection against inflation, monetary devaluation, and a decline in the value of paper money. Typical slogans contained in DSI's newspaper advertisements and pamphlets include: "We're bullish on bullion"; "Silver coins—A unique investment opportunity"; and "Fight back with silver!"

A prospective retail customer of DSI may purchase a bag of silver coins on either a cash or margin basis. If the customer purchases on a cash basis, he pays the full purchase price plus a 2-percent sales commission and is entitled to take immediate delivery of the coins. The vast majority of customers however, encouraged by DSI, purchase bags on a margin or credit transaction. In such a transaction, the customer makes a downpayment (known as a margin deposit) and borrows the balance of the purchase price from DSI, using the value of the coins as collateral for the loan. In addition to the 2-percent sales commission, the customer pays interest on the unpaid balance. When the margin purchaser completes payment on a bag of coins, he is entitled to take possession in the same manner as cash customers.

DSI maintains only a small inventory of coins which would be inadequate to meet its obligations if any large number of margin purchasers made full payment and demanded delivery. Rather, DSI "covers" each customer purchase order by buying an equivalent number of bags from CWI. These purchases from CWI are also usually made on a margin basis. CWI may in turn cover the DSI order in a variety of ways. It can set aside a unit of coins from its limited physical inventory, or it may either purchase a "futures contract" on margin (a standardized contract for the future delivery of silver coins at a specified date and price and traded on an exchange) or purchase a "forwards contract" on margin (an unstandardized contract for future delivery of silver coins and not traded on an exchange). At all times DSI and

CWI have endeavored to maintain a "flat" (100-percent covered) position with respect to customer purchases.

No coins held as cover on contracts for the future delivery of coins are purchased in the name of any DSI customer. Funds received from the purchasers are pooled and used by DSI and CWI to cover their respective obligations. Although the coins and contracts used as cover are not segregated to the accounts of individual customers, DSI has never failed to deliver a bag of coins when a purchaser paid the balance of the purchase price and demanded delivery.

Prior to making any payment on a purchase of silver coins, a DSI customer signs a contract known as a "Customer Coin Account Agreement" detailing the rights and obligations of both parties to the transaction. The customer is advised in this agreement that DSI may in the future make a "margin call" requiring the customer to pay a specified portion of the unpaid balance owed DSI in the event that the price of silver on the national market falls below a specified price. When the price of silver declines, CWI is subject to margin calls from the national dealers with whom it has placed covering purchase orders. When CWI gets such a margin call, it makes a call on DSI, which passes it on to the margin customer. The risk of margin calls is affected solely by the price movement of silver on the national market.

DSI also promotes a practice known as "remargining." When the price of silver fluctuates upward, the value of the coins held as collateral for the margin purchases also increases. This permits DSI to extend additional credit to its customers. By making only a small additional margin deposit, or in some cases no additional deposit, a purchaser can remargin his account and buy more silver. However, remargining also exposes the customer to greater risk, for if the price of silver suddenly drops, he might be faced with a margin call that exceeds his ability to pay.

The lower court found that even though margin sales did not resemble securities as that term is commonly understood, they nevertheless were the sale of investment contracts because de-

fendants had to perform certain postsale activities. These activities included the covering of customer accounts and liquidation of forwards and futures contracts to meet customer demands. Although covering and liquidation were both largely mechanical operations, they were found to be essential to the realization of profits from margin sales transactions. Additionally, it was necessary for both DSI and CWI to remain financially solvent, and since futures and forwards contracts were not earmarked for specific margin customers, the insolvency of either corporation could jeopardize the customer's ability to receive his bag of silver coins.

■ Defendants first contend that the state's action was abated by the Commodity Futures Trading Commission Act of 1974 (CFTA), P. L. 93-463, 88 Stat. 1389, which vested exclusive jurisdiction to regulate margin contracts with the Federal Commodity Futures Trading Commission (Commission). The CFTA became effective on April 21, 1975, during the time the present case was pending, and consisted of amendments to the Commodity Exchange Act, 7 USCA, §§ 1 to 22.

Section 201(b) of the CFTA (7 USCA, § 2) provides that the act is to apply to certain previously enumerated commodities and generally to "all 'other goods and articles * * * and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." More specifically, § 217 (7 USCA, § 15a[a]) states in part:

"No person shall offer to enter into, enter into, or confirm the execution of any transaction for the delivery of silver bullion, gold bullion, or bulk silver coins or bulk gold coins, pursuant to a standardized contract commonly known to the trade as a margin account, *margin contract,* leverage account, or leverage contract contrary to any rule, regulation, or order of the [Commission] designed to insure the financial solvency of the transaction or prevent manipulation of fraud * * *." (Italics supplied.)

It was also the intent of Congress to make the regulatory power

of the Commission exclusive with respect to margin sales of silver coins, as evidenced by § 201(b) of the CFTA (7 USCA, § 2), which provides that "the Commission shall have exclusive jurisdiction with respect to * * * transactions subject to regulation by the Commission pursuant to section 217 [7 USCA, § 15a]."

The present controversy concerns the effect on pending state proceedings of § 412 of the CFTA (not coded), which states:

"Pending proceedings under existing law shall not be abated by reason of any provision of this Act but shall be disposed of pursuant to the applicable provisions of, the Commodity Exchange Act, as amended, in effect prior to the effective date of this Act."

Defendants urge us to construe this section narrowly to find that only those actions pending at the time of amendment under the Commodity Exchange Act, as opposed to those pending under state law, were unabated by the 1974 amendments.

It is true that some courts, most notably from Texas, have taken the position that § 412 abated pending proceedings under state law. See, e. g., Clayton Brokerage Co. v. Mouer, 531 S. W. 2d 805 (Tex. 1975), approving State v. Monex International, Ltd. 527 S. W. 2d 804 (Tex. Civ. App. 1975). All of these cases, however, dealt with actions by state securities authorities seeking injunctive relief under their blue sky laws. In contrast to injunctive relief, which is prospective in nature, the relief granted by the lower court in the present case was a simple declaratory judgment that operated retrospectively to declare defendants' sales of silver coins on margin to be the sale of investment contracts within the meaning of Minn. St. 1974, § 80A.14(n).

We are persuaded that § 412 was not intended to abate pending actions under state law that seek remedies which, like declaratory judgments, are wholly retrospective. This construction in no way impinges on the exclusively Federal jurisdiction over margin sales after April 21, 1975, the effective date of the

CFTA. We also believe that this result is consistent with the following remarks of Senator Herman Talmadge (D. Ga.), chairman of the committee which approved the senate bill for the CFTA (120 Cong. Rec. 18,864, 18,866 [Oct. 10, 1974]):

"* * * This Act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the [Commission]. Congress was aware that there have been ongoing efforts by various state and federal regulators to prevent some of these abuses. Accordingly, section 412 was included in the bill to make clear that all pending proceedings * * * should continue unabated by any provision of the Act."

■   Defendants also contend that L. 1975, c. 371, which amended the definition of "security" contained in Minn. St. 1974, § 80A.14(n), makes it clear that the unamended definition did not embrace margin sales. At the time of trial, § 80A.14(n) included the term "investment contract" within its comprehensive definition of "security."[1] In the 1975 legislative session, the definition was amended by L. 1975, c. 371 (now coded as Minn. St. § 80A.14 [q]), to also include "investment metal contract."[2] The adoption

[1] Minn. St. 1974, § 80A.14(n), defined "security" in pertinent part as follows: " 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable shares; *investment contract*; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining right, title or lease or in payments out of production under such a right, title or lease; or, in general, any interest or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (Italics supplied.)

[2] The term "investment metal contract" is further defined by Minn. St. 80A.14(k) to mean: "(i) a sale of an investment metal or investment gem in which the seller or an affiliate of the seller retains possession of the investment metal or investment gem; or

(ii)   a contract of purchase or sale which provides for the future de-

of this amendment, defendants contend, created a presumption that the legislature intended to change pre-existing law, and therefore the unamended statute did not include within its ambit the margin sales of silver coins.

It is true that this court in the past has recognized this presumption, Western Union Tel. Co. v. Spaeth, 232 Minn. 128, 44 N. W. 2d 440 (1950), but not as an immutable proposition. When the language of an amendatory statute is intended to clarify rather than enlarge the powers of the original statute, the presumption is rebutted. Brotherhood of Ry. & Steamship Clerks, Etc. v. State, 303 Minn. 178, 229 N. W. 2d 3 (1975); Christensen v. State, Dept. of Conservation, 285 Minn. 493, 175 N. W. 2d 433 (1970). We believe that the inclusion of the term "investment metal contract" by L. 1975, c. 371, in the comprehensive definition of "security" contained in Minn. St. 1974, § 80A.14 (n), was more likely intended as a legislative clarification than as a substantive addition. Consequently, we find the presumption relied upon by defendants to be rebutted.

■ Defendants principally argue that their margin sales of silver coins were not the sale of investment contracts within the meaning of Minn. St. 1974, § 80A.14(n), and urge us to reach this conclusion by applying the Federal guidelines for determining the existence of an investment contract. The United States Supreme Court has defined the term "investment contract" for purposes of the Federal Securities Act of 1933 as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." S. E. C. v. W. J. Howey Co. 328 U. S. 293, 298, 66 S. Ct. 1100, 1103, 90 L. ed. 1244, 1249 (1946).

---

livery of an investment metal or investment gem, or any option to purchase or option to sell such a contract; or

(iii) a sale of an investment metal or investment gem pursuant to contract known to the trade as a margin account, margin contract, leverage account, or leverage contract."

In contrast to the fairly rigid Howey test, we have continued to abide by a broader and more flexible standard. In State v. Gopher Tire & Rubber Co. 146 Minn. 52, 56, 177 N. W. 937, 938 (1920), we defined an investment contract as "[t]he placing of capital or laying out of money in a way intended to secure income or profit from its employment." As recently as 1973, this court exhaustively reviewed the history of securities regulation in this state and concluded that although "the Howey test is useful in identifying most 'investment contracts,' we decline to adopt it as exclusive under our statute." State, by Spannaus, v. Investors Security Corp. 297 Minn. 1, 11, 209 N. W. 2d 405, 410 (1973). We remain convinced that the Gopher Tire test is better suited to facilitate the objectives of our securities act, which is designed to protect investors by regulating the merits of securities offered for sale to the public.[3]

The marketing by defendants of silver coins on a margin basis leaves little doubt in our minds that they were selling investment contracts within the contemplation of Minn. St. 1974, § 80A.14(n). Defendants vigorously advertised these coins in their promotional literature as a method of investment for profit and, at best, were taking a calculated risk that their activities were not in violation of our securities laws. Had they entertained any doubt, they could have requested a written advisory opinion from the state securities commissioner, as the parties concede. See, Minn. St. 80A.26, subd. 5.

It is also apparent that the margin buyer, in contrast to a purchaser under an ordinary installment contract, was forced to rely on the continued financial stability of CWI and DSI. Since no futures or forwards contract was specifically earmarked for an individual customer, the financial failure of defendants would

[3] Even if we were to apply the Howey test as defendants have urged, it would not necessarily follow upon this record that a margin sale of silver coins is not the sale of an investment contract. See, Jenson v. Continental Financial Corp. 404 F. Supp. 792 (D. Minn. 1975).

have made it difficult if not impossible for the purchaser to obtain delivery of his bag of silver coins.

Additionally, contrary to the implications of the trial court's findings, it is our opinion that, although many of defendants' postsale activities may have been largely mechanical, defendants nevertheless had to possess a specialized skill in trading silver on the highly volatile national market. Decisions as to when to buy or when to sell silver held as inventory, and when to buy or when to sell forwards and futures contracts, are illustrative of the types of decisions that required expert business judgment.[4] How well defendants made these decisions could not help but have had a direct impact on the amount of profit or loss realized by individual margin customers. We therefore conclude that the investing public was entitled to the statutory protections contained in our securities provisions.

Affirmed.

---

[4] We regard the trial court's finding that such decisions have no effect on a purchaser's risk of profit or loss as clearly erroneous. See, Rule 52.01, Rules of Civil Procedure; In re Estate of Balafas, 293 Minn. 94, 96, 198 N. W. 2d 260, 261 (1972); In re Trust known As Great Northern Iron Ore Properties, 308 Minn. 221, 225, 243 N. W. 2d 302, 305, certiorari denied sub nom. Arms v. Watson, 429 U. S. 1001, 97 S. Ct. 530, 50 L. ed. 2d 612 (1976).