Lawrence JENSON, et al., Appellants,

v.

TOUCHE ROSS & CO., defendant and third party plaintiff, Respondent,

and

Lawrence LOKKEN, Defendant,

v.

CONTINENTAL FINANCIAL CORPO-RATION, et al., Third Party Defendants.

No. C3–81–1170.

Supreme Court of Minnesota.

June 17, 1983.

Charles S. Zimmerman, Minneapolis, Edward W. Glickman, Minneapolis, for appellants.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Craig W. Gagnon and Michael J. Bleck, Minneapolis, for respondent.

SIMONETT, Justice.

This class action arises out of an audit prepared by the defendant accounting firm,

and raises issues on evidentiary rulings relating to the claim of negligence against the defendant auditor and whether the defendant violated the state consumer fraud, the state false advertising, or the state securities statutes. Another issue is whether the trial court erred in denying a pretrial motion to disqualify defendant's counsel from representing the defendant because of an alleged conflict of interest. Based on the jury's special verdict answers, the trial court ordered judgment of no liability in favor of the defendant. Plaintiffs appeal from a denial of their motion for judgment notwithstanding the verdict or a new trial. We affirm.

Appellant-plaintiff class members are customers of Continental Coin Exchange, Inc., who claim to have suffered financial loss as a result of their purchases of bulk silver coins on margin from Continental Coin. Plaintiffs were successful in making a partial recovery in a separate federal court action against Continental Coin and its principals, which eventually went bankrupt. Plaintiffs then brought on for trial this state court action against defendant-respondent Touche Ross & Co., which had conducted an audit of Continental Coin.

Continental Coin (the sales division of Continental Financial Corporation) was in the business of selling silver coins in bulk as investments. The customer could pay cash and take physical possession of the coins or could buy on margin, paying down only a portion of the purchase price. If a margin purchase, Continental Coin would loan the customer the purchase price balance and was obliged to deliver the coins to the customer on payment of the margin debt, but not before. A customer could, however, close out the purchase and realize any appreciation in value without taking physical delivery of the coins. In 1973, at the time of the audit, 80 to 90% of Continental Coin's business was margin business.

Rather than purchasing silver coins, Continental Coin secured its obligations to customers primarily by making purchases in the futures market parallel to and offsetting its customers' margin purchases.

These purchases would be made daily to reflect aggregate net sales for the day. The futures contracts were themselves purchased on margin and in Continental Coin's name, without identification or connection to any particular customer. The testimony was that Continental Coin was in a complete "hedge" at all times and thereby was protected from any exposure to risk of market fluctuations. At the time of the audit, less than 1% of Continental Coin's customer obligations were secured by physical bags of coins in Continental Coin's possession. A detailed description of Continental Coin's operations is described in *Jenson v. Continental Financial Corp.,* 404 F.Supp. 792 (D.Minn.1975). *Compare State, by Spannaus v. Coin Wholesalers, Inc.,* 311 Minn. 346, 250 N.W.2d 583 (1976) (a functionally similar operation).

In July 1973, Continental Coin retained Touche Ross to audit its balance sheet for the end of the fiscal year, August 31, 1973. (The poor internal company controls at the beginning of the year precluded any audit of a profit and loss statement.) The audit was completed and "signed off" on November 5, 1973. The audit report concluded with the statement by Touche Ross that "[i]n our opinion, the aforementioned consolidated balance sheet presents fairly the financial position of Continental Financial Corporation and subsidiary at August 31, 1973 in conformity with generally accepted accounting principles."

Not long after the audit report was issued in November 1973, Continental Coin ran into problems. Sometime in early 1974 Wisconsin issued a cease and desist order, finding that Continental Coin's contracts were the sale of unregistered securities. Eventually, investigations started in Minnesota, New York, South Dakota, and other states. Plaintiffs here started their federal court class action in January 1975, and at that time Continental Coin stopped selling coins on margin entirely and terminated existing margin accounts.

In July 1977 plaintiffs commenced this state court action against Touche Ross, alleging seven counts, of which three—

breach of contract, punitive damages, and sale of unregistered securities—were dismissed prior to or during trial. The remaining counts were: (1) fraudulent sale of securities, (2) common law negligence, (3) statutory consumer fraud, and (4) statutory false advertising. The basis of all these claims was Touche Ross' failure to disclose, either in the accountant's audit opinion letter or otherwise thereafter, that Continental Coin was being investigated by the securities commissions of Wisconsin and Michigan and the Federal Securities and Exchange Commission to determine whether its sale of bulk silver coins on margin constituted the sale of securities.

After a 5-week trial on the issues of liability only (the trial was bifurcated, the damages issues along with perplexing issues of causation to be resolved later), the jury found that (1) defendant Touche Ross did not knowingly make or omit any untrue statement of a material fact, either before or after November 7, 1973; (2) defendant was not negligent, either before or after November 7, 1973; (3) defendant did not knowingly use or knowingly employ a misleading statement or a deceptive practice with intent that others rely upon it; and (4) defendant did cause an advertisement to be published with intent to induce the public to enter into an obligation, but that the advertisement did not contain a statement of fact which defendant knew was untrue, deceptive or misleading.

### A.

We first take up the claims of error relating to the jury's finding of no negligence on the part of defendant Touche Ross. Appellant-plaintiffs concede that there is evidence sufficient to sustain the verdict of no negligence. They contend, however, that various evidentiary rulings so prejudiced their negligence claim that a new trial is required.

Before discussing these evidentiary rulings, some further factual background will be helpful. While the audit was being conducted, defendant Touche Ross became aware that the securities commissions of two states were investigating Continental Coin's operation to determine whether its transactions were sales of commodities, as the company maintained, or sales of securities which had to be registered and thus could be rescinded by the customer. In response to Continental's standard "audit inquiry letter" to its corporate counsel, Touche Ross obtained two letters, the first dated September 14, 1973, from Lawrence Lokken, who had earlier served as secretary and corporate counsel for Continental Coin, which concluded, "It is our opinion that the sales in question do not involve the sale of a security."[1] The second letter, dated November 5, 1973, was from Miles Efron, the then current corporate counsel, who specifically noted the Wisconsin and Michigan investigations but stated he knew of "no transactions or business activities which have had or might have a significant effect on the financial position" of the company.[2] There was also a letter from attorney Lokken to the Minnesota Department of Commerce, Securities Division, written in March

---

1. The pertinent paragraph of Mr. Lokken's letter reads:

Except as stated below, we know of no transactions or changes in business activities and policies which have had or might have a significant effect on the financial position or results of operations of the Companies. Continental Coin Exchange Inc. sells coins in bulk in transactions which conceivably could be characterized as sales of securities and hence made in violation of federal and state securities laws. If the sales do constitute sales of a security, substantial liabilities to customers could arise. It is our opinion that the sales in question do not involve the sale of a security.

2. Mr. Efron's letter stated, in part—

We know of no litigation or claims which are presently outstanding or which would result in an ultimate cost to or recovery by the companies. It should be noted, however, that in the event either the Michigan or Wisconsin securities commissions decide that the transactions of Continental Coin Exchange, Inc., during the year with respect to residents of those respective states constitute sales of a "security" or a "commodity", necessitating a recission and then a registration, some loss could occur but only to the extent that silver contracts, as purchased by customers, had diminished in value below their purchase price.

1973, confirming a telephone call in which Lokken had described Continental Coin's operations, and an attorney for the division had indicated agreement with his opinion that these did not constitute the sale of securities. Although Touche Ross was aware of this Lokken letter, it had not received it by the time the audit was signed off. There was also evidence that in September 1973 representatives of the Securities and Exchange Commission visited with Continental Coin. It seems the SEC voiced no objections at the time but neither was a formal "no-action" letter requested or issued.

Touche Ross' opinion letter, issued on November 5, 1973, was unqualified, and neither the opinion nor the audit report made any mention of the securities issues or pending investigations. At trial, plaintiffs' experts testified that disclosure should have been made by the auditor; defendant's experts testified to the contrary. Touche Ross' witnesses testified that the securities issue was primarily a legal question, for which they relied on the letters of corporate counsel and management's representations as to the absence of contingent liabilities. Further, since silver prices were rising, the likelihood of customers affording themselves of rescission was lessened and, in any event, only a relatively few sales had been made in Wisconsin and Michigan.

Appellants claim that they were prejudiced by four evidentiary rulings. We first note that evidentiary rulings on materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence are committed to the sound discretion of the trial judge and will only be the basis for reversal where that discretion has been clearly abused. *See, e.g., Hiedeman v. Hiedeman,* 290 Minn. 210, 187 N.W.2d 119 (1971); *Colby v. Gibbons,* 276 Minn. 170, 175 (Minn.1979). Further, as we stated in *Poppenhagen v. Sornsin Construction Co.,* 300 Minn. 73 at 79–80, 220 N.W.2d 281 at

286 (1974), in construing Minn.R.Civ.P. 61, "before an error in the exclusion of evidence may be grounds for a new trial, it must appear that such evidence might reasonably have changed the result of the trial if it had been admitted."

1. *Postaudit events.* A key evidentiary ruling occurred at the beginning of the trial and is asserted here by appellant as prejudicial error. The trial court ruled that evidence of what the securities commissions of Wisconsin and Michigan did after November 5, 1973, "probably shouldn't go in." In other words, the trial judge felt that Touche Ross' duty of care should be judged by the state of affairs as of the time it signed off the audit since it was rendering an opinion on Continental Coin's financial position only as of then. At the same time, the trial judge was aware that the fact that the then-pending investigations later resulted in cease and desist orders subsequent to the audit report might be relevant to whether the pending investigations should have been noted in the audit report. Noting this was "a difficult situation," the trial judge qualified his exclusionary ruling in two respects: (1) He said he would permit the admission of evidence to show that Continental Coin ceased operations as a result of any cease and desist order, but that the jury would be cautioned this evidence would not necessarily establish defendant's negligence as of November 5, 1973; and (2) "[i]nsofar as anything after November 5, 1973, I'm going to require a specific offer of proof on a tie up"—that is, plaintiffs would have to show that the status of the investigations as of November 5 were likely to culminate in the subsequent cease and desist orders.

So far as the trial transcript shows,[3] appellants made no offers of proof to "tie up" events subsequent to November 5, 1973, but the jury did know that Wisconsin issued a cease and desist order and that other investigations ensued. Consequently, the only

---

**3.** We have been furnished with a partial transcript of four volumes. To determine the impact of keeping certain evidence out, it is sometimes necessary to know what was allowed in, and with a partial transcript it is not always easy here to put the evidentiary rulings complained of in a proper context.

issue here is the appropriateness of the trial court's ruling just described.

■ The auditing standard here applicable is undisputed. Because the task of an independent auditor is to evaluate and report on the financial statements issued by a company *at a particular time, Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 549 (S.D.N.Y.1977), the auditor must modify or withdraw its earlier opinion when it subsequently discovers a fact which was in existence at the time the auditor reached its conclusion. Thus, subsequent discoveries or developments are relevant only if they render the company's financial statements or the auditor's report misleading or inaccurate when issued. *See* AICPA, Statement on Auditing Standards No. 1, ¶ 561. The expert witnesses of both parties so testified. Here, although the securities issue existed at the time of the audit, Touche Ross had at that time the opinions of the lawyers that the contract sales were not securities; and the subsequent decisions on that issue by the Michigan and Wisconsin securities departments were not facts in existence at the time of the audit report. Thus these subsequent events could not give rise to a further duty on the auditor to withdraw or modify its report, absent an offer of proof as required by the trial court.

■ We hold that the trial court properly exercised its discretion in excluding the post-audit evidence in the manner that it did. The fact that plaintiffs apparently made no further offers of proof to "tie up" postaudit events would seem to indicate also that plaintiffs found the court's ruling acceptable.

■ There was also evidence, however, that shortly after the audit was issued, Continental Coin prepared a sales brochure entitled *"The Silver Book,"* in which were included the financial statements and Touche Ross' opinion letter. While issuance of *The Silver Book* was a postaudit event, to the extent Touche Ross knew of its preparation before November 5, 1973, or approved of its use—and the evidence was conflicting on this point—a duty to modify the audit report might arise. As we read the record, plaintiffs were not precluded from presenting evidence on this issue, especially in the expert testimony. The trial court also, in fashioning the special verdict question, separated defendant's negligence to before and after November 5, 1973. We hold that, as to the issue of defendant's duty to modify its audit report after November 5, 1973, plaintiffs were not prejudicially precluded from presenting evidence.

■ 2. *The Price Waterhouse audit materials.* About the same time Touche Ross was making its audit, Price Waterhouse & Co. (another "Big Eight" accounting firm) was making an audit of Pacific Coast Coin Exchange, d.b.a. Monex, a company purportedly operating similarly to Continental Coin. Price Waterhouse, however, withdrew from its audit because of regulatory uncertainties, including a longstanding investigation by the SEC and state investigations by Wisconsin and New York. Plaintiffs made an offer of proof to put in the work papers of Price Waterhouse and a deposition of an officer of Price Waterhouse given in an SEC proceeding to which Touche Ross was not a party. We hold that the trial court did not err in excluding evidence of the Price Waterhouse audit for lack of foundation and relevance.

■ The auditor's standard of care was made clear in this case by all the expert witnesses, namely, that contingent liabilities must be disclosed where they involve a considerable degree of uncertainty and where an adverse outcome would have a material effect on the financial statements. As the trial court correctly ruled, the Price Waterhouse evidence, being only an illustration of how another audit was handled, is inadmissible on the defendant's standard of care. To the extent the evidence was offered to show that defendant Touche Ross breached the standard of care, the trial court was within its discretion in excluding the evidence on the grounds that the circumstances of the Price Waterhouse audit were not sufficiently identical to the Touche Ross audit.

3. *Touche Ross & Co.'s internal manuals.* In cross-examining Touche Ross personnel, plaintiffs questioned them about the firm's internal guides and manuals for conducting an audit and whether those guidelines had been followed. After first ruling that an employer's rules would not be admissible, the trial court permitted testimony about them. The trial court concluded that the manuals should be treated like learned treatises under Minn.R.Evid. 803(18). Counsel were permitted to read from the manuals during their closing arguments but the jury was not allowed to take the text into the jury room for deliberations.

 In our view, the internal auditing guidelines were admissible as admissions of a party, and so should have been received when first offered. *See* Minn.R.Evid. 801(d)(2). Whether the excerpts from the manual containing the pertinent guidelines should have gone to the jury as documentary exhibits lies within the trial judge's discretion. *Cf. Lines v. Ryan,* 272 N.W.2d 896 (Minn.1978) (trial court allowed portions of a party's pretrial statement to be read to the jury, but, to avoid prejudice, the document itself was not admitted into evidence). Usually it would seem discretion is better exercised by allowing into evidence the kind of documents involved here unless this would be confusing or give undue significance to the evidence. *Compare* Minn.R. Evid. 803(5) (recorded recollection) *and* Rule 803(18) (learned treatises) (testimony about but not documentary submission thereof is permitted on the theory the jury would otherwise attach too much significance to the documents). Here the jury was made well aware of the contents of the manuals, and the plaintiffs were not prejudiced by the manuals themselves not being put in the jurors' hands. We affirm the trial court's ruling.

 4. *The National Accounting Standards.* Plaintiffs offered in evidence certain Statements on Auditing Standards (SAS–1) (on adequacy of information disclosures) and Accounting Research Bulletins (ARB–50) (on liabilities), both publications of the American Institute of Certified Public Accountants. Treating these exhibits as learned treatises under Minn.R.Evid. 803(18), the trial court allowed counsel to read them to the jury, but refused to allow the standards, as documentary exhibits, to be received. Plaintiffs claim it was error to refuse to receive the standards as exhibits. We disagree. Whether the standards might be also admissible as documentary exhibits under some other subdivision of Rule 803, we think here it was proper to treat them as learned treatises, and plaintiffs were not prejudiced thereby. *See* 4 D. Louisell & C. Mueller, Federal Evidence § 465 at 837–38 and § 466 at 855 (1980) (suggesting formally drawn industry standards may be admitted as a learned treatise).

### B.

Appellant-plaintiffs next raise issues relating to the consumer fraud statute, the false advertising statute, and the Minnesota Uniform Securities Act.

1. *The Consumer Fraud Act.* Minn. Stat. § 325F.69, subd. 1 (1982), provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

The jury found that Touche Ross did not knowingly use or knowingly employ a misleading statement or a deceptive practice with intent that others rely on it. The jury also found that Touche Ross was not negligent. Plaintiffs argue, however, that the consumer fraud statute must be construed to impose strict liability, and, therefore, it was error for the trial court, by its instructions, to have imposed on them the additional requirements of proving that any misleading statements or deceptive practices were *knowingly* made or employed. Plaintiffs argue that the public policy which prompted the consumer fraud act—protection of innocent customers—requires imposition of strict liability since Touche Ross

"should have the burden to insure that its audits do not contain misrepresentations or misleading statements."

■ We think, contrary to Touche Ross' position, that the statute applies to the sale of investment contracts, since the term "merchandise" is defined in the act as including both "commodities" and "intangibles." We do, however, agree with the trial court and the defendant that the statute does not create strict liability. Section 325F.69, subd. 1, speaks of "fraud" and "misrepresentation," of promises that are "false" and statements that are "misleading" or practices which are "deceptive." We conclude that these terms, given their plain, ordinary meaning, denote at least some degree of culpability. In the absence of a clear legislative intent, we think it is inappropriate to impose a strict liability standard here, especially since it would mean using a consumer protection statute to second-guess the professional judgment of accounting practitioners. *Compare City of Mounds View v. Walijarvi*, 263 N.W.2d 420 (Minn.1978) (because of the judgmental nature of their work product, this court declined to extend the implied warranty/strict liability doctrine to cover architects and other vendors of professional services).

2. *The False Advertising Statute.* Plaintiffs contend that the trial court erred in ruling that Minn.Stat. § 325F.67 (1982),[4] the false advertising statute, requires knowing misconduct and in so submitting the issue to the jury. We need not reach the issue of whether knowing or intentional conduct is required, because we conclude

that the statute, by its terms, does not apply to the defendant.

Since Touche Ross' unqualified audit report appeared in Continental Coin's advertisement, *The Silver Book,* plaintiff customers claim a violation of section 325F.67. It seems clear to us, however, that the statute is directed at sellers who advertise. Thus, "[a]ny person * * * who, with intent to sell or in anywise dispose of * * * securities," may be liable for disseminating an advertisement containing misrepresentations. Plaintiffs argue that the accountant for the seller-advertiser is also included because the accountant is a person who "with intent to * * * induce the public in any manner to enter into any obligation relating thereto" causes, even indirectly, the dissemination of false advertising. But to what does "relating thereto" refer? Its only possible antecedent is "merchandise, securities, service or anything *offered by such person,* firm, or association." (Emphasis added.) Since Touche Ross was not offering anything, it cannot possibly have the requisite intent to induce others to buy.

■ We hold that section 325F.67, as a matter of law, does not apply to the accountant whose audit report to the seller-advertiser is included in the advertisement of the seller-advertiser.

3. *The Minnesota Uniform Securities Act.* The first count in plaintiff's complaint alleges that defendant Touche Ross "aided and abetted" Continental Coin in the fraudulent sales of securities in violation of Minn.Stat. §§ 80A.01 and 80A.03 (1982). Plaintiffs' second count alleges that defendant engaged as "an agent" of Continental

---

**4.** Minn.Stat. § 325F.67 (1982), in pertinent portions, provides, albeit in convoluted fashion:
 Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to * * * induce the public in any manner to enter into any obligation relating thereto, * * * makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public * * * an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, * * * which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

Coin in the sale of unregistered securities contrary to Minn.Stat. § 80A.08 (1982).

On the second count, the sale of unregistered securities by an agent, we hold, as did the trial court, that as a matter of law defendant Touche Ross was not an agent of Continental Coin.

Civil liability for the sale of unregistered securities under our state act is imposed by section 80A.23, subds. 1 and 3. The civil liability imposed on a seller under subdivision 1 is extended under subdivision 3 to "every broker-dealer or agent who materially aids in the act or transaction constituting the violation." The term "agent" is defined in section 80A.14, subd. 3, as "any individual other than a broker-dealer who *represents* a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." (Emphasis added.) Here, Touche Ross did not represent Continental Coin in any transaction nor did it effect or attempt to effect any sales. Touche Ross did no more than perform an independent audit of the balance sheet of the seller; indeed, the professional standards require that Touche Ross maintain its independence from its audit clients. The commissioner's note to section 401(b) of the Uniform Securities Act, from which our section 80A.14, subd. 3, is taken, provides that the term "agent" depends "upon much the same factors which create an agency relationship at common law." At common law it must be shown that the principal has the right to control the agent's conduct in performing the service. *See, e.g., Vieths v. Ripley,* 295 N.W.2d 659, 664 (Minn.1980). The record here contains neither evidence to suggest that Continental Coin in fact exercised or attempted to exercise any control over Touche Ross, nor that Touche Ross assented to act subject to Continental Coin's control. The trial court ruled that Touche Ross was not an agent and we affirm.

Plaintiffs' first count alleges that defendant Touche Ross "aided and abetted" Continental Coin in the fraudulent sale of securities. While civil liability for sale of unregistered securities is limited to sellers, broker-dealers and agents, section 80A.23, subd. 2, imposes civil liability for fraudulent sales in violation of 80A.01 on any person who sells such a security and on "any person who violates section 80A.03 in connection with the purchase or sale of any security." Thus it appears, at least as to violations of section 80A.03, that civil liability may be imposed on persons other than sellers or agents. Apparently it is plaintiffs' claim that, although Touche Ross may not be a seller or an agent, it "aided and abetted" a fraudulent sale. The trial court, however, ruled as a matter of law that there was no intent on Touche Ross' part to defraud. We agree. Plaintiffs go on to argue, however, that to prove liability they need not establish *scienter* (*i.e.,* an intent to defraud) as set out in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 *reh'g denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), but that a showing of recklessness is enough. We need not resolve this issue. It is enough here that the jury found both that Touche Ross did not knowingly make any untrue statements and that Touche Ross was not negligent. Since Touche Ross was not negligent, any claim of recklessness (which requires something more than negligence) is moot. The trial court's ruling of no violation of the antifraud sections of the state Uniform Securities Act is affirmed.

4. *Other claims.* Plaintiff-appellants assert other trial errors, mainly with respect to the jury instructions, and contend further that if no one error is enough the cumulative effect of all the errors requires a new trial. We find no merit in these claims. The trial was a long one with many issues and many rulings, but our review of the record reveals the trial was well managed and the issues fairly tried.

### C.

The final issue, and in some ways the most troublesome, is appellants' claim that there must be a new trial because the trial court erred in denying their pretrial motion to disqualify the law firm of Oppenheimer, Wolff, Foster, Shepard & Donnelly from

acting as attorneys for defendant Touche Ross. This alleged error was preserved in appellants' post-trial motions and again denied.

The facts are these. In January 1975, plaintiffs brought a class action in federal court against Continental Coin and others, to which Touche Ross was added as an additional defendant. In March 1976 Continental Coin and its affiliates settled with plaintiffs, the settlement being secured by a security agreement on assets of the Continental Coin defendants. In May 1976 another creditor filed involuntary bankruptcy petitions against the Continental Coin defendants. In April 1977, all further proceedings in the federal court action were stayed pending resolution of the bankruptcy proceedings.

The validity of the settlement and the security agreement was litigated in bankruptcy court, culminating in an appeal to the Eighth Circuit which was argued in September 1978 and decided in February 1979. *See Jenson v. Continental Financial Corp.*, 591 F.2d 477 (8th Cir.1979). Finally, in January 1980, almost 4 years after plaintiffs' settlement with Continental Coin, the federal district court granted final approval of the settlement. At the same time, the remaining causes of action against Touche Ross in the federal district court action were voluntarily dismissed without prejudice, thus ending the federal court litigation.

In July 1977, soon after the federal court stay, plaintiffs commenced this second action in state court against Touche Ross. This action, too, was stayed pending resolution of the federal court actions. Once the federal court litigation was concluded in early 1980, the state court action, the subject of this appeal, was reactivated.

When Touche Ross was first sued in federal court in 1975, it retained its customary counsel, the Oppenheimer firm, to represent it, with Craig Gagnon as lead counsel. When Touche Ross was again sued in July 1977 in state court, it again retained the Oppenheimer firm and Mr. Gagnon to handle its defense. By the summer of 1977, it

became evident to plaintiffs, represented throughout all this litigation by Charles S. Zimmerman and Edward W. Glickman, that they needed legal assistance in the federal court proceedings on the bankruptcy issues. Plaintiffs, therefore, retained a sole practitioner, attorney James H. Levy, a bankruptcy specialist, as co-counsel in August 1977. Mr. Levy thereafter represented the plaintiff class in association with Messrs. Zimmerman and Glickman through July 1979, a period of over 2 years.

The disqualification question arises because, in November 1979, Mr. Levy joined the Oppenheimer firm "of counsel." For the Oppenheimer firm to represent the defendant Touche Ross when one of its firm members formerly represented the plaintiffs, created, argue the plaintiffs, a conflict of interest requiring the Oppenheimer firm to withdraw as counsel for Touche Ross. Plaintiffs allege violations of Canons 4 (protecting client confidences), 5 (independent professional judgment), and 9 (avoiding the appearance of professional impropriety) of the Code of Professional Responsibility. Plaintiffs' counsel, in his affidavit, states that Mr. Levy had argued the appeal in the Court of Appeals and was in close contact with plaintiffs' regular counsel who disclosed trial plans and strategy that went beyond the bankruptcy issues and in some instances related to defendant Touche Ross; that in considering the advisability of compromising the federal court action counsel reviewed with Mr. Levy the remaining litigation against Touche Ross. The defendant Touche Ross, on the other hand, submitted affidavits of Mr. Gagnon, Mr. Levy, and its general counsel, stating that the actions in both federal and state court against Touche Ross were essentially dormant because of the court-ordered stays during the period Mr. Levy was co-counsel for plaintiffs; that the litigation with which Mr. Levy was concerned related only to bankruptcy matters, not to the separate claims against Touche Ross; and that Mr. Levy had not and would not discuss the case with other members of the Oppenheimer firm. Mr. Levy, in his affidavit, denied he had been

consulted or involved in general strategy or proceedings extraneous to bankruptcy matters while representing plaintiffs.

The trial court denied the pretrial motion to disqualify. Balancing the equities and applying the "substantial relationship" test of *National Texture Corp. v. Hymes,* 282 N.W.2d 890 (Minn.1979), the trial court found (1) that Mr. Levy's connection to plaintiffs was solely through their counsel; (2) that his representation was limited to collection of the settlement made with the Continental Coin defendants; (3) that plaintiffs did not show that the earlier discussions with Mr. Levy on bankruptcy strategy would disadvantage plaintiffs in this litigation; (4) that disqualification would add substantially to Touche Ross' costs; and (5) that Mr. Levy's bankruptcy representation did not bear a substantial relationship to the pending state court action. The trial court allowed the Oppenheimer firm to continue its representation of Touche Ross with the proviso that Mr. Levy and the members of the Oppenheimer firm were not to discuss the lawsuit in any way with each other. "Were this litigation just beginning," added the trial court, "a different light might be placed upon the motion."

1. The trial court properly applied the analytic approach given in *Hymes.* We think, however, we should say more about the "substantial relationship" test, since that test refers more to the degree of proof required than to what is to be proved. *See Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 (7th Cir.1978) ("the substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the .professional obligation.")

First, it is well to remember that the issue is whether the canons have been violated to the extent and under the circumstances that a lawyer or lawyers must withdraw from representing a client. Canon 4 requires that a client's confidences be protected. The problem arises when the lawyer finds himself or herself representing a new client in a matter involving the former client. The lawyer may believe that no confidences were obtained from the former client or, if obtained, would not be used on behalf of the new client. But even if this be so, the former client cannot always know this, and, furthermore, the relationship is complicated by the lawyer's obligation under Canon 7 to represent the new client "zealously." Finally, Canon 9 says the lawyer must avoid even the "appearance of professional impropriety."

As the law first developed, disqualification was found quite readily, since the integrity of the profession in the eyes of the public was paramount, and often the mere appearance of impropriety was enough. In more recent years, attention has also been given to countervailing interests, having in mind the organization and structure of today's law practice with the increase in size of law firms and the mobility of lawyers among firms. Thus, it is recognized that disqualification separates the client from his chosen counsel, causes delay, and may subject both the client and the disqualified lawyer to significant economic hardship. *See, e.g.,* Note, *Developments in the Law: Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244 (1981); Howard M. Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy,* 73 Nw.U.L.Rev. 996 (1979).

2. In applying the canons in a disqualification case, we think the approach should be generally as follows:

(a) Considering the facts and the issues involved, is there a substantial, relevant relationship or overlap between the subject matters of the two representations? *Hymes, supra.*

(b) If so, then certain presumptions apply: First, it is presumed, irrebuttably, that the attorney received confidences from the former client and he or she will not be heard to claim otherwise. *Hymes, supra.* Second, it is also presumed, but subject to rebuttal, that these confidences were conveyed to the attorney's affiliates. *See Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories,* 607 F.2d 186, 197 (7th Cir.1979); *Silver*

*Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 757 (2nd Cir. 1975); *Gas-A-Tron of Arizona v. Union Oil Co.*, 534 F.2d 1322, 1324–25 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

(c) Finally, at this stage, if reached, the court weighs the competing equities. *See, e.g., Woods v. Covington County Bank*, 537 F.2d 804, 810, 813 (5th Cir. 1976).

3. In this case we have the allegation of a sharing of client confidences by a sole practitioner arising out of successive representations and an imputation of those confidences to the sole practitioner's current affiliates. (This is different from a case of concurrent adverse representations or the case where an attorney leaves government practice for private practice, the so-called "revolving door" situation.)

The trial court found that Mr. Levy's bankruptcy representation did not bear a substantial relationship to the subject matter of the Touche Ross litigation. During the period from August 1977 through December 1979, when Mr. Levy was associated with plaintiffs' counsel, only the bankruptcy matters, for which Mr. Levy had been specifically retained, were being litigated and the Touche Ross litigation was dormant. Still, there is the claim by plaintiffs' counsel, denied by Mr. Levy, that matters beyond the bankruptcy retainer were discussed, including future strategies against Touche Ross. Indeed, the trial court's order forbidding Mr. Levy to discuss the case with the Oppenheimer firm is somewhat inconsistent with the finding of no substantial relationship between Mr. Levy's successive representations. Thus, we conclude that there is at least arguably a substantial overlap or relationship between Mr. Levy's successive representations of Continental Coin's customers and Oppenheimer's representation of Touche Ross in its defense against those customers. Therefore, it could be irrebuttably presumed that Mr. Levy received confidences from his former clients. (Mr. Levy, of course, quite properly abstains from any claim that he personally should now be able to represent Touche Ross.) But it is also then presumed that Mr. Levy conveyed these confidences to his present Oppenheimer affiliates; this presumption, however, may be rebutted. Here we conclude that the trial court found, on an adequate factual basis, that the presumption was rebutted.

This brings us to the third step, namely, weighing the competing equities. We agree with the trial court's balancing of the equities. Plaintiffs are asking for disqualification of a firm of over 80 lawyers. Mr. Levy's connection with his new firm is only "of counsel." The Oppenheimer firm had represented Touche Ross in this litigation for almost 5 years before Mr. Levy joined the firm, and it would have been a severe economic hardship to have denied Touche Ross its chosen counsel. Then, too, Mr. Levy represented the plaintiff customers at a time when the Touche Ross litigation was dormant. In this instance, for the Oppenheimer firm to continue to represent its client with a "Chinese Wall" separating Mr. Levy does not offend the appearance of professional proprieties under Canon 9. Finally, aside from some amorphous allegations, there is really no showing that any discussions plaintiffs' regular counsel might have had with Mr. Levy on strategies prejudiced them in the state court action.

"[A]n inexorable disqualification of an entire firm for the disqualification of a single member or associate, is entirely too harsh, and should be mitigated by appropriate screening such as we now have here." *Kesselhaut v. United States*, 555 F.2d 791, 793 (Ct.Cl.1977). "A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir.1976). We conclude that the trial court did not exceed the bounds of its proper discretion in denying, for reasons of "great-

er fairness," plaintiffs' motion to disqualify defendant's counsel.

Affirmed.