James LeSAGE, Sr., et al., Appellants,

Donald LeSage, Plaintiff,

v.

NORWEST BANK CALHOUN-ISLES, N.A., a.k.a. Fifth Northwestern National Bank, et al., Respondents.

No. C0-87-202.

Court of Appeals of Minnesota.

July 21, 1987.

Craig M. Mertz, Wurst, Pearson, Larson, Underwood & Mertz, Minneapolis, for appellants.

Joseph Henry Otterstetter, Faegre & Benson, Minneapolis, for respondents.

Heard, considered, and decided by LANSING, P.J., and RANDALL and HUSPENI, JJ.

## OPINION

RANDALL, Judge.

James, Donald and Dorothy Powers LeSage appeal the trial court's grant of summary judgment on their claim under the Consumer Fraud Act, Minn.Stat. § 325F.69 (1982). We reverse and remand for trial.

## FACTS

In January 1980, after selling her home, Gudrun LeSage asked her three adult children, James, Donald and Dorothy, to help her find an investment that would provide her with a monthly income. Donald LeSage previously met two or three times with John Marceau, president of Town and Country Credit Company, Inc., and discussed the possibility of investing Gudrun's money with Town and Country. Town and Country had a line of credit loan from Norwest Bank Calhoun-Isles, N.A. (Norwest). Marceau recommended the LeSages speak with Norwest vice president John Hawkland about Town and Country's creditability and financial resources. On January 28, 1980, Donald, Dorothy and Gudrun LeSage met with John Hawkland to discuss the investment of Gudrun LeSage's money.

At this January 28 meeting, set up by Marceau, appellants allege Hawkland made certain misleading statements to induce the LeSages to invest in Town and Country. The LeSages claim Hawkland made a number of misleading statements. He assured the LeSages that Town and Country was a

secure investment. He advised the LeSages that if Town and Country paid 11% or more interest, they should invest Gudrun's money for two years. He told appellants that members of his family had invested in Town and Country. He also told them Norwest had no investment opportunities which would make monthly interest payments, nor could Norwest match Town and Country's interest rate. Hawkland allegedly advised the LeSages that, if they invested in a one year note with Town and Country, the principal could be withdrawn on demand. Hawkland denies he either intentionally deceived or misled appellants.

After talking to Hawkland, Gudrun,[1] Donald and Dorothy LeSage met with Marceau and invested Gudrun's money in a one year, 11% promissory note with Town and Country. The note contained the following language:

> The payee, and each subsequent holder, by the acceptance hereof agrees that payment of the indebtedness evidenced by this promissory note shall, at all times, be subject, subsequent and subordinate to the prior payment of all indebtedness (herein called "bank indebtedness") now or hereafter owing by the undersigned [Town and Country] to any State or National banking association for money loaned, advanced, or made available to the undersigned * * *.

Apparently neither Hawkland nor Marceau ever advised Gudrun, James or Dorothy LeSage that any money owed to them by Town and Country would be completely subordinate to all debts owed to Norwest by Town and Country.[2]

---

1. Gudrun LeSage died in October, 1983, and her estate is not a party to this action. Suit was brought in 1983. Her adult children brought this action and proceeded directly as beneficiaries on the note.

2. The status of Donald LeSage as a plaintiff is not clear from the record. It is alleged that Donald LeSage may have known more about the relationship between Town and Country and Norwest than his brother, sister and mother. It is not disputed that he, alone of his family, benefitted financially by a side deal with Town and Country, whereas his mother, his brother and sister did not. The record discloses a state-

ment by the attorney for James and Dorothy LeSage that Donald LeSage withdrew from the action, assigned his interest to James and Dorothy LeSage, and was not represented by his brother and sister's attorney of record. Such issues as whether or not Donald LeSage is a proper party plaintiff or is somehow barred from proceeding by the doctrine of unclean hands and, if so, do his acts color the claims of James and Dorothy LeSage were not specifically addressed by the trial court and, thus, were not placed before us on review and are not addressed by this opinion.

The record discloses that the same day Gudrun LeSage invested her $80,000 with Town and Country, Town and Country paid $80,000 to Norwest to reduce Town and Country's debt on its line of credit loan. Hawkland was aware that this would happen when he discussed the advisability of investing in Town and Country with appellants and, allegedly, did not disclose it.

Town and Country made timely interest payments to Gudrun LeSage until her note matured January 28, 1981. At maturity, Donald LeSage asked Town and Country to pay the principal. Marceau told him Town and Country could not pay the principal at maturity, but volunteered that if the promissory note was executed for a second year, the $80,000 principal could be retired in monthly $10,000 installments.

A second one year subordinated note, containing the same language as the first, was executed at 13% interest. Both the first and second notes were made payable "to the order of Gudrun LeSage in trust for Dorothy Powers and Donald LeSage and James LeSage." In addition to offering increased interest, Town and Country privately reduced by 2% the interest rate on an unrelated business loan of Donald LeSage's.

Town and Country continued to make interest payments on this second note, but never made any of the promised $10,000 installment payments. On February 20, 1981, Norwest ordered a partial liquidation of Town and Country. On September 15, 1982, Hawkland instructed Town and Country to make no further payments to its subordinated note holders. Town and Country made its last interest payment to Gudrun LeSage in July 1982.

Appellants began this action against Norwest, Hawkland, Marceau and Marceau Sports[3] alleging fraud misrepresentation, breach of fiduciary duty, and violation of the Consumer Fraud Act, Minn.Stat. §§ 325F.68—325F.70 (1982). Appellants' amended complaint contained five causes of action: 1. a claim of misrepresentation and unjust enrichment; 2. a claim against John C. Marceau; 3. a claim for punitive damages; 4. a deceptive sales practices claim under Minn.Stat. § 325F.69 and Minn.Stat. § 8.31 (1982); and 5. a claim of breach of fiduciary duty to explain contract.

Norwest Bank moved for summary judgment before the trial court. The motion was heard May 14, 1986. On August 4, 1986, the trial court issued its order and memorandum dismissing appellants' first, second, third and fifth causes of action. Appellants' fourth cause of action under Minn.Stat. § 325F.69 was specifically preserved. No appeal was taken from this action of the trial court. Pursuant to respondent's request to the trial court to reconsider its preservation of appellants' fourth cause of action, the trial court on October 23, 1986, issued an order without a memorandum dismissing appellants' fourth and last remaining cause of action.

Appellants brought a motion before the trial court, asking for a rehearing on the trial court's dismissal of their section 325F.69 claim. The court denied the motion, and this appeal from the summary dismissal of appellants' cause of action under the Consumer Fraud Act followed.

## ISSUE

Did the trial court err by granting summary judgment against appellants on their cause of action under the Consumer Fraud Act claim?

## ANALYSIS

*Summary Judgment*

Summary Judgment is properly entered when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law.

---

**3.** Marceau Sports, owned by John Marceau, is a subordinated note holder to whom Town and Country made principal payments.

Minn.R.Civ.P. 56.03. The movant bears the burden of proof and the non-moving party has the benefit of that view of the evidence most favorable to him. *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn.1981). On appeal from a grant of summary judgment, this court's function is to determine whether genuine issues of material fact exist and whether the trial court erred in applying the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979).

### Consumer Fraud Act Claim

The trial court ruled in its October 23, 1986, order that appellants failed to make a showing of proximate cause under Minn. Stat. § 8.31. Minn.Stat. § 8.31, subd. 3a is to be read together with the Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1. Section 325F.69 defines consumer fraud as:

[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, *whether or not any person has in fact been misled, deceived,* or damaged thereby, is enjoinable as provided herein.

(Emphasis added). Minn.Stat. § 8.31, subd. 3a states:

In addition to the remedies otherwise provided by law, any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court. The court may, as appropriate, enter a consent judgment or decree without the finding of illegality. In any action brought by the attorney general pursuant to this section, the court may award any of the remedies allowable under this subdivision.

Among the statutes enumerated in Minn. Stat. § 8.31, subd. 1 is Minn.Stat. § 325F.69.

The Consumer Fraud Act applies to the sale of investment contracts, since the definition of "merchandise" includes "commodities" and "intangibles." *Jenson v. Touche*

*Ross & Co.,* 335 N.W.2d 720, 728 (Minn. 1983). Section 325F.69 does not impose strict liability. *Id.* The terms of the statute:

given their plain, ordinary meaning, denote at least some degree of culpability.

*Id.*

Respondents argue that because the trial court granted summary judgment on appellants' common law fraud claim based on lack of proximate cause, their Consumer Fraud Act claim also cannot stand. We do not agree. The Consumer Fraud Act is broader than common law fraud. The Consumer Fraud Act allows recovery for "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice," and does not require that the target of the statements or deceptive practices have, in fact, been misled or damaged where the relief sought is an injunction. Minn.Stat. § 325F.69, subd 1. The Consumer Fraud Act requires the statements or acts be done with the intent that someone else rely on them.

In their complaint, appellants alleged that respondents' conduct "constituted a deceptive practice within the meaning of Minn.Stat. section 325F.69." Respondents argued, and the trial court agreed, that appellants did not make a showing of proximate cause. Appellants argue on appeal that they made an adequate showing of proximate cause.

We note Minn.Stat. § 325F.69, subd. 1, allows claimants to seek an injunction without having to prove actual damages. Here, appellants are not seeking an injunction but are seeking monetary damages under Minn.Stat. § 8.31, subd. 3a. Appellants, in bringing forth evidence at trial, will bear the burden of proving the proper legal nexus between the complained of acts and their alleged monetary losses.

Respondents argue that, as a matter of law, they could not have caused appellants' loss. They claim that Hawkland was involved only in the transactions surrounding the first note, and that, accordingly, he cannot be held liable for appellants' losses that resulted when Town and Country de-

faulted on the second note, even assuming that appellants' claims are true.

The trial court found, based on *Farmers State Bank of Blakeley v. Miller,* 168 Minn. 199, 209 N.W. 869 (1926), that respondents' act was not the proximate cause of appellant's loss. *Farmers* is distinguishable on the facts and does not control.

*Farmers State Bank* holds that, by renewing a note, a party waives his defense of fraud for acts giving rise to a cause of action on the original note. The fact situation here is completely distinguishable from *Farmers,* and the trial court's reliance on *Farmers* was misplaced. In *Farmers,* the claimant knew of the misrepresentations prior to renewing the note:

> Long before the last renewal of the note, defendant knew that the stock was not paying any dividends.

*Id.* 209 N.W. at 869.

As part of its analysis, the supreme court in *Farmers* found as decisive:

> The original note ran for six months. It was then renewed and a payment made not only of interest but of $40 on the principal. The first renewal note ran for a year. Interest was again paid and a second renewal given in 1923. The operation was repeated in February, 1924, when the note in suit, the third renewal, was given and another year's interest paid. In the meantime and relatively soon after his purchase, defendant must have discovered the utter falsity of the representation, the principal one claimed, that the stock was paying regularly an 8 per cent dividend. To that extent defendant discovered the fraud which he claims was perpetrated upon him long before his last renewal of the note and probably before one or more of the others. He was not only put upon inquiry but was advised of the fraud, if fraud in fact existed.

*Id.* at 200–201, 209 N.W. at 870. The supreme court went on to find that the claimant was chargable "as a matter of law" with knowledge of the fraud "if in fact he was defrauded, before he executed as a

third renewal of the original the note now in suit." *Id.* at 201, 209 N.W. at 870.

*Farmers,* of course, discussed common law fraud rather than the Consumer Fraud Act and deceptive practice,[4] but respondents and the trial court analogized to *Farmers* and relied on it, thus, we distinguish *Farmers.* The language in *Farmers* is clear. The claimant on the note knew or was chargable with the claimed fraud before subsequent renewals. Under those circumstances, the claim of fraud was waived.

Here it cannot be taken as a given, for purposes of summary judgment, that appellants were chargable, as a matter of law, with knowledge of respondents' alleged deceptive practices. Not until *after* the first renewal did Norwest partially liquidate Town and Country, and not until about eight months after the second renewal did Norwest completely foreclose Town and Country from making further payments to the LeSages or other Town and Country customers. Also, respondents relied heavily on their theory that the second note was an independent, isolated transaction from execution of the first note. They argue that, since appellants did not reconsult with Hawkland before renewing the second note, the issue of Hawkland's alleged deceptive practices is moot because, if such practices occurred, they occurred only in connection with the first note.

We find present a genuine issue of material fact as to whether or not the two notes were independent transactions or should be viewed as one entity. For instance, at the expiration of the first note, some member of the LeSage family demanded payment in full from Marceau. Marceau was unable to comply, and instead induced appellants to extend that note by offering a higher interest rate and agreeing to pay $10,000 installments on the unpaid principal.

In addition to this agreement, Marceau privately negotiated with Donald LeSage, in return for LeSage's cooperation, a reduction of interest on a debt Donald LeSage alone owed Town and Country. It is apparent from the factual setting that a serious

4. *Farmers* was decided in 1926 and the Consumer Fraud Act was initially enacted in 1963.

question arises as to whether or not appellants had any choice about renewal. A substantial question arises as to whether or not they were "forced" to go along with Marceau's suggestion that they renew in order to have the option of getting back at least some money. If, in fact, the LeSages did not freely pass up a chance to collect from Town and Country their $80,000 in January of 1981, but had no practical alternative but to go along with a renewal, the bank's liability on this second note, which could be construed as just an extension of the first note, presents a question of fact to be resolved at trial. If the finder of fact concludes appellants had no option but to renew, the legal liability of the bank for any deceptive practices that led to the signing of the first note is an issue yet to be resolved.

Appellants claim the following evidence supports their claim of deceptive practices under the Consumer Fraud Act at least to the extent needed to survive a summary judgment motion: Town and Country was in financial trouble in January 1980 due to rapidly rising interest rates charged by Norwest on Town and Country's line of credit. The language of the note was drafted by Norwest. Hawkland advised appellants on January 28, 1980, that the Town and Country note was a secure investment. Hawkland failed to disclose his potential conflict of interest in the matter. Hawkland falsely represented to appellants that his family invested in Town and Country. Hawkland told appellants the note was payable on demand, when, in fact, it was not. Gudrun LeSage's right to payment of the principal was subordinate to that of Norwest. Appellants argue that if respondents deny false representations were made, or deny that the statements were a deceptive practice, this raises a genuine issue of material fact, and the matter was improperly dismissed by summary judgment.

Appellants further claim that while Hawkland may not have owed appellants a fiduciary duty, he undertook to advise them, "facilitating John Marceau's desire that the LeSages invest their $80,000 in Town and Country, and [he] engaged in deception to do so."

By their allegations that Hawkland made misrepresentations of facts known to him, or within his knowledge when he made them, with an intent that the LeSages rely on his statements and invest with Town and Country, appellants have presented genuine issues of material fact under the Consumer Fraud Act, and we remand their claim for trial.

## DECISION

The trial court erred by granting respondents summary judgment on appellants' Consumer Fraud Act claim.

Reversed and remanded for trial.

LANSING, J., specially concurs.

LANSING, Judge (concurring specially).

I concur in the result.