Jackie LENNARTSON, Respondent,

v.

ANOKA–HENNEPIN INDEPENDENT
SCHOOL DISTRICT 11,
Appellant.

No. C6–01–1278.

Court of Appeals of Minnesota.

Feb. 5, 2002.

Eric D. Satre, Connor, Satre & Schaff, L.L.P., Minneapolis; and Lawrence R. Altman, Minneapolis, for respondent.

Eric J. Magnuson, Patrick J. Sauter, Peter D. Gray, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, for appellant.

Considered and decided by HANSON, Presiding Judge, TOUSSAINT, Judge, and FOLEY, Judge.*

## OPINION

HANSON, Judge.

In the underlying action, respondent sued her former employer for sexual discrimination. After the law firm representing respondent withdrew, the law firm for the former employer hired a lawyer who had been an associate in the law firm that formerly represented respondent, and then established an ethical wall between that lawyer and the lawyers representing the employer. Respondent moved to disqualify the law firm from representing the employer. The district court granted the motion, applying its interpretation of Rule 1.10(b) of the Minnesota Rules of Professional Conduct. Appellant argues the district court used an incorrect test for disqualification and, under the proper test, disqualification is not warranted. We reverse and remand.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

## FACTS

Respondent Jackie Lennartson brought a sex-discrimination claim against appellant Anoka–Hennepin Independent School District 11 (School District). Lennartson retained Gregg Corwin of the law firm Gregg M. Corwin Associates Law Office, P.C. (Corwin Associates) to represent her, and the School District retained Rider, Bennett, Egan & Arundel, L.L.P. (Rider Bennett).

Corwin Associates employed lawyer Susanne Fischer, an associate, who took one deposition in connection with Lennartson's sex-discrimination claim. In preparation for that deposition, Fischer reviewed Lennartson's file and discussed it with Corwin.

Shortly after Fischer took the deposition, Corwin Associates withdrew from representing Lennartson. Fischer then left Corwin Associates and began working for Rider Bennett. Before joining Rider Bennett, Fischer completed a conflicts and screening report in which she reported her involvement in the Lennartson case. Rider Bennett erected an ethical wall to ensure that Fischer would have no discussion concerning the Lennartson matter with the lawyers representing the School District. Approximately one month after hiring Fischer, Rider Bennett notified Lennartson that it had hired Fischer.

Lennartson wrote to the district court (1) informing it that she had been unable to secure new representation, and (2) arguing that Rider Bennett should be disqualified from representing the School District because it had hired Fischer. The district court construed Lennartson's letter as a motion to disqualify Rider Bennett. After a hearing, the district granted Lennartson's motion, ordered the School District

Minn. Const. art. VI, § 10.

to retain new counsel, and continued the trial for six months to allow new counsel to prepare for trial. This appeal followed.

## ISSUE

Did the district court err when it disqualified Rider Bennett as the School District's legal counsel?

## ANALYSIS

A reviewing court need not defer to the district court's application of the law when the material facts are not in dispute. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989). Also, an appellate court independently reviews the district court's interpretation of the Minnesota Rules of Professional Conduct. *Prod. Credit Ass'n v. Buckentin*, 410 N.W.2d 820, 823 (Minn.1987) (stating that to ensure uniform application, the reviewing court must retain the final, independent interpretive authority to define the scope and application of those rules).

The School District argues that the district court erred by disqualifying Rider Bennett based solely on its interpretation of Rule 1.10(b) of the Minnesota Rules of Professional Conduct. The School District asserts that the district court instead should have followed the three-part balancing test set forth by the Minnesota Supreme Court in *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 731–32 (Minn. 1983). Conversely, Lennartson argues that the district court properly relied on the test set forth by Rule 1.10(b), because the Minnesota Supreme Court's adoption of Rule 1.10 impliedly superceded the test for disqualification set forth in *Jenson*.

We begin with an assessment of the continued viability of the three-part test for disqualification set forth in *Jenson*, in light of the promulgation of the Rules of Professional Conduct two years later. Next, we analyze the present facts under

the *Jenson* factors. Finally, we examine the present facts under Rule 1.10(b).

## I

In 1983, the Minnesota Supreme Court addressed the question of disqualification in a situation in which Lawyer at Firm # 1, who represented Client # 1, later moved to Firm # 2, which represented Client # 2, a party adverse to Client # 1 in the same matter. *Jenson*, 335 N.W.2d at 730. Client # 1 moved to disqualify Lawyer's associates and partners at Firm # 2 from representing Client # 2. *Id.* The motion was based on the then effective Code of Professional Responsibility. *Id.* Client # 1 alleged violations of Canons 4 (protecting client confidences), 5 (independent professional judgment), and 9 (avoiding the appearance of professional impropriety). *Id.*

The court recognized that the Code of Professional Responsibility addressed the relationship between Lawyer and Client # 1, but did not address the rights of Client # 2 to select its own lawyer, to proceed to trial without undue delay, and to avoid economic hardship. *Id.* at 731. The court determined that when a motion is made to disqualify Client # 2's chosen lawyer, the court cannot look solely to the canons, but must follow an approach that also considers the rights of Client # 2. *Id.* at 731–732. The court therefore adopted a three-step approach to disqualification issues:

(a) Considering the facts and the issues involved, is there a substantial, relevant relationship or overlap between the subject matters of the two representations?

(b) If so, then certain presumptions apply: First, it is presumed, irrebuttably, that the attorney received confidences from the former client * * *. Second, it is also presumed, but subject to rebuttal,

that these confidences were conveyed to the attorney's affiliates.

(c) Finally, at this stage, if reached, the court weighs the competing equities.

*Id.* at 731–32 (citations omitted).

Two years after issuing its decision in *Jenson,* the Minnesota Supreme Court adopted the Minnesota Rules of Professional Conduct to replace the Minnesota Code of Professional Responsibility. Rule 1.10(b) provides as follows:

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) unless there is no reasonably apparent risk that confidential information of the previously represented client will be used with material adverse effect on that client because:

(1) any confidential information communicated to the lawyer is unlikely to be significant in the subsequent matter;

(2) the lawyer is subject to screening measures adequate to prevent disclosure of the confidential information and to prevent involvement by that lawyer in the representation; and

(3) timely and adequate notice of the screening has been provided to all affected clients.

Minn. R. Prof. Conduct 1.10(b).

Lennartson argues that Rule 1.10(b) superceded *Jenson* and eliminated any weighing of equities. In fact, Lennartson argues, and the district court agreed, that Rule 1.10(b) requires disqualification if any one of the three factors cannot be met. We will discuss below our interpretation of

Rule 1.10(b), but will consider first whether the district court erred by not following *Jenson,* even if we assume that Rule 1.10(b) was violated.

■ We observe, first, that there is nothing in the Rules that explicitly states an intent to supercede *Jenson.* Further, the supreme court has continued to cite *Jenson* with approval even after it adopted the Rules. *See, e.g., Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 868–69 (Minn.1989) (stating that *Jenson* provided a well-defined approach to the question of disqualification); *Prod. Credit Ass'n,* 410 N.W.2d at 823–25 (citing *Jenson* when considering whether the subject matters of two representations were substantially related); *Humphrey ex rel. State v. McLaren,* 402 N.W.2d 535, 543 (Minn.1987) (citing *Jenson* for a flexible test for disqualification for a 'substantial relationship' between a current and prior client representation.).

As an error-correcting court, we are bound to follow the supreme court's precedent. Despite the adoption of the Rules in 1985, the supreme court has given no indication of an intent to overrule *Jenson.* Moreover, the rationale in *Jenson,* that the former Code of Professional Responsibility did not address all interests raised in a motion to disqualify a client's chosen counsel, applies equally to the present Rules of Professional Conduct. Thus, until the supreme court indicates otherwise, the balancing test for disqualification set forth in *Jenson* is controlling.

## II

According to the facts presented, the *Jenson* test does not require Rider Bennett's disqualification.

*Substantial, Relevant Relationship*

■ The School District concedes that, because Fischer reviewed Lennartson's

file and conducted a deposition on Lennartson's behalf in the same matter, a substantial relevant relationship or overlap between the subject matter of the two representations exists. *See Jenson*, 335 N.W.2d at 731.

### Communication of Confidences

As to the communication of confidences, the presumption that Fischer received confidences from Lennartson is irrebuttable under *Jenson*. But, the presumption that Fischer conveyed these confidences to the School District can be rebutted. And, according to the district court's findings, it was effectively rebutted because [n]o evidence exists that client secrets or other information has been shared by Ms. Fischer with other Rider, Bennett attorneys.

This finding was supported by the evidence that (1) Fischer did not communicate any client confidences to Rider Bennett; (2) Fischer is one of 140 lawyers at Rider Bennett and she and her staff work on a different floor than the School District's lawyers and their staff; (3) Fischer and the School District's lawyers do not share support staff or storage areas; (4) Rider Bennett placed all the files relating to the Lennartson matter in a storage cabinet inside the office of one of the School District's lawyers; (5) Rider Bennett instructed Fischer and her staff to have no contact with the Lennartson files and not to discuss the matter with lawyers or staff involved in the School District's defense; and (6) Rider Bennett instructed the School District's lawyers and their staff that they must not discuss the Lennartson matter with Fischer or her staff.

Based on the district court's findings, which are not clearly erroneous, we conclude that Rider Bennett rebutted the presumption that Fischer conveyed confidences obtained from Lennartson to Rider Bennett.

### Balancing the Equities

*Jenson* instructs the court to weigh the competing equities. At the disqualification hearing, the district court identified the following equities:

1. The delay a disqualification would create for the School District, because it would have to hire new counsel, and the new counsel would need time to prepare;

2. The additional cost the School District would incur by hiring new counsel who would have to learn the entire case;

3. Lennartson's perception that Fischer's employment with Rider Bennett would place her at a disadvantage;

4. Lennartson's desire to delay the trial to allow her additional time to obtain representation;

5. Repeated continuances result in denying other litigants the right to have their cases heard promptly; and

6. The public's perception that the adversary system works and that a lawyer who represents them will do so with complete devotion.

An additional equity is the School District's right to be represented by the attorney of its choice. *See In re Estate of Janecek*, 610 N.W.2d 638, 642 (Minn.2000) (stating that a party has a substantial right to be represented by its attorney of choice).

Only two of the equities (Lennartson's perception that she would be disadvantaged and the public's perception of lawyer devotion) even arguably weigh in favor of Rider Bennett's disqualification. Those equities were not considered sufficient to require disqualifications in *Jenson*, and they are likewise insufficient here.

## III

The discussion above assumes that Rule 1.10(b) was violated under the facts of this case. But we conclude otherwise, and this provides an alternative basis for our decision.

In the memorandum attached to its disqualification order, the district court determined that Rule 1.10(b) was conjunctive; that is, each of the three factors must be satisfied. Thus, the district court would read Rule 1.10(b) to require that the lawyer establish that (1) the information communicated by the Client is unlikely to be significant in a later matter; *and* (2) an ethical wall was erected; *and* (3) notice was given. The district court concluded that Rider Bennett failed the first factor of the conjunctive test, thereby failing the entire test.

While we agree that the format of Rule 1.10(b) is one that is typically associated with a conjunctive rule, we interpret the rule to be conjunctive in part and disjunctive in part. The district court's interpretation would deprive the second factor, the erection of an ethical wall, of any meaning or function. This is because, if the information communicated is *not* significant, there would be no need for an ethical wall, and if the information communicated is significant, the erection of an ethical wall would be deemed unavailing. In order to give any meaning to the ethical wall factor, it is necessary to conclude that the rule was intended to be both conjunctive and disjunctive; that is, (1) either the information communicated is unlikely to be significant *or* (2) an ethical wall must be erected *and* (3) appropriate notice must be given.

 Here, the parties agree that the information obtained by Fischer is likely to be significant. Thus, Rule 1.10(b) required that Rider Bennett erect an ethical wall and notify Lennartson that it had hired Fischer. Rider Bennett did erect an ethi-

cal wall, the effectiveness of which is not challenged, and Rider Bennett did give notice. Accordingly, we conclude that Rule 1.10(b) was not violated.

## DECISION

Because the *Jenson* test for disqualification is controlling law, and an analysis under *Jenson* does not require Rider Bennett's disqualification, we reverse the disqualification order and remand for trial.

**Reversed and remanded.**