**Jackie LENNARTSON, Petitioner, Appellant,**

v.

**ANOKA–HENNEPIN INDEPENDENT SCHOOL DISTRICT NO. 11, Respondent.**

No. C6–01–1278.

Supreme Court of Minnesota.

June 5, 2003.

Lawrence R. Altman; Eric D. Satre, Connor, Satre & Schaff, LLP, Minneapolis, for Appellant.

Eric J. Magnuson, Patrick J. Sauter, Peter D. Gray, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Appellant Jackie Lennartson retained the law firm of Gregg M. Corwin and Associates to represent her in a sexual harassment action against her former employer, the Anoka Hennepin Independent School District No. 11. The school district retained the law firm of Rider, Bennett, Egan & Arundel, LLP (Rider Bennett) to assist in its defense. Susanne Fischer worked as a lawyer with the Corwin firm and took one deposition on behalf of Lennartson. Corwin subsequently withdrew

as Lennartson's lawyer. Approximately three months after Corwin withdrew as Lennartson's lawyer, Fischer was hired as an associate lawyer at Rider Bennett. After learning that Fischer was with Rider Bennett, Lennartson moved to have Rider Bennett disqualified as the school district's lawyer. The district court granted the motion under Minn. R. Prof. Conduct 1.10(b). The Minnesota Court of Appeals reversed, concluding that the appropriate test for evaluating disqualification is that created by this court in *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720 (Minn.1983). The court of appeals held that, under the *Jenson* test, disqualification is not appropriate on these facts; and alternatively, if Rule 1.10(b) is the correct test, disqualification is not required. We reverse.

In October 1999, appellant Jackie Lennartson retained the law firm of Gregg M. Corwin and Associates to represent her in a sexual harassment action under the Minnesota Human Rights Act. Minn.Stat. § 363.01–.20 (2002). Lennartson commenced her action on November 20, 1999 by serving her former employer, respondent Anoka Hennepin Independent School District No. 11, with a Summons and Complaint. The certificate of representation and parties attached to the Summons and Complaint listed Gregg M. Corwin as Lennartson's lawyer. The school district filed its answer on December 15, 1999, listing as its lawyer the law firm of Rider Bennett, a firm of approximately 140 lawyers.

During the next year, the parties engaged in the following discovery: (1) the school district took Lennartson's deposition on August 22, 2000 with Lennartson, Corwin, and two lawyers for the school district present; (2) Corwin, assisted by Jennifer Duchscherer, a law clerk with his firm, deposed Timothy Ducklow and David Piechocki on September 18, 2000; (3) Corwin, assisted by Duchscherer, deposed Alfred Blue on August 18, 2000; and (4) Susanne Fischer, a lawyer with Gregg M. Corwin and Associates, deposed Louis Klingelhoets with Duchscherer's assistance on September 18, 2000.[1] Lennartson asserts that Fischer conducted "a crucial deposition," and that Fischer told Lennartson that she would "review the entire file" in preparation for the deposition. There is no evidence that either party conducted any further discovery.

On December 1, 2000, the parties appeared before the district court in response to Corwin's motion to withdraw himself and his law firm as Lennartson's counsel. The court granted the motion in a written order dated December 15, 2000, in which the court reasserted a trial date of March 5, 2001.

On March 5, 2001, when the case was called for a bench trial, Lennartson stated she was not ready to proceed because she had been unable to retain new counsel after Corwin's withdrawal. The district court construed this as a request for a continuance, which it granted. The court acknowledged the school district's objection to the continuance and noted that Lennartson had been given repeated reminders of the trial date. Accordingly, the court set a new trial date of June 1, 2001, but made clear, "[t]his is a trial date certain and there will be no further continuances of this trial date."[2] (emphasis omitted).

---

1. Lennartson alleged in her complaint that Ducklow and Piechocki sexually harassed her and Klingelhoets was the department supervisor. Blue appears to be another school district employee who may have witnessed some of the alleged misconduct.

2. The court also awarded the school district a $4,000 senior lien on any of Lennartson's recovery in recognition of its costs in preparing for the March 5, 2001 trial date.

On March 26, 2001, Fischer was hired by Rider Bennett as an associate lawyer. In her "conflicts and screening report," Fischer disclosed that she had done "isolated work" in the Lennartson case, which she elaborated to mean she had filled in for Corwin on one deposition and had no involvement before or after that deposition. Based on this information, a member of Rider Bennett's conflict and ethics committee determined that "[Fischer] had not acquired any confidential information that would be significant in the matter" and could, therefore, be hired as long as proper notice was given and appropriate screening procedures were implemented.

The screening measures implemented by Rider Bennett were as follows. Affidavits were provided from the Rider Bennett lawyers who worked on this case and their assistants stating that they were specifically advised by the ethics committee not to discuss the case with Fischer or her staff and had not done so. Fischer and her staff were told of the ethical wall and told they were not allowed access to any information about the Lennartson case. Fischer was also physically screened from the case. The lawyers who worked on the case officed on a different floor than Fischer and they had "separate secretaries, separate legal assistants, and separate storage areas." Additionally, the files for the Lennartson case were stored in a cabinet on a separate floor from Fischer's office and each had two stickers stating: "AN ETHICAL WALL HAS BEEN IMPOSED ON THIS FILE WITH RESPECT TO ATTORNEY SUSANNE FISCHER"; and the cabinet in which these files were stored had a sign stating, "AN ETHICAL WALL HAS BEEN IMPOSED ON LENNARTSON VS. ANOKA–HENNEPIN SCHOOL DISTRICT NO. 11, 10924/r21611 WITH RESPECT TO ATTORNEY SUSANNE FISCHER."

Approximately one month after hiring Fischer and after screening her from Lennartson's case, Rider Bennett sent Lennartson a letter informing her that Fischer had joined the firm. Upon receiving the letter, Lennartson wrote to the district court stating that she had been unable to retain new counsel and that she believed Rider Bennett should withdraw from representing the school district. On May 24, 2001, after the case had been continued twice and one week before the case was scheduled to go to trial, the court conducted a hearing on Lennartson's motion to disqualify Rider Bennett. On June 6, 2001, the court granted the motion.

The district court made the following findings of fact: (1) Fischer took one deposition in connection with Lennartson's case; (2) Fischer reviewed the entire Lennartson file in preparation for that deposition; (3) while employed at Rider Bennett, Fischer did not work on Lennartson's case and the firm had instituted an ethical wall to ensure her nonparticipation; and (4) no evidence exists that Fischer shared any information with Rider Bennett regarding the case. The court then made the following conclusions of law: (1) the subject matters of the representations are substantially related; (2) Fischer received significant confidential information on the Lennartson case when she worked with Corwin; and (3) "competing equities" weigh in favor of Lennartson. The court went on to state that Minn. R. Prof. Conduct 1.10(b) controls, the three subparts to Rule 1.10(b) are conjunctive because they are "joined together by 'and' as opposed to 'or' or some other word of joinder," and under the rule disqualification is warranted. Accordingly, the court granted the motion to disqualify and continued the case for at least six months, setting a new trial date for February 13, 2002.

The school district appealed and the court of appeals reversed and remanded for trial. The court of appeals determined that Rule 1.10(b) is "conjunctive in part and disjunctive in part"; that the *Jenson* test is still the appropriate analytical tool for evaluating disqualification; and that under *Jenson*, Rider Bennett's disqualification is not required. *Lennartson v. Anoka–Hennepin Indep. Sch. Dist. 11*, 638 N.W.2d 494, 497–99 (Minn.App.2002). Lennartson petitioned for review and we granted her petition.

## I.

■ The issue presented in this case requires an interpretation of the Minnesota Rules of Professional Conduct. Specifically, it requires us to determine whether Minn. R. Prof. Conduct 1.10(b) should be read conjunctively as it was by the district court, or as conjunctive in part and disjunctive in part, as it was read by the court of appeals. Once we interpret the rule, we must then address the question of whether the three-part balancing test we established in *Jenson*, 335 N.W.2d 720, conflicts with that interpretation and, if so, whether the *Jenson* test has been superceded by Rule 1.10(b) in cases of imputed disqualification of lawyers in the private sector. We have stated that we "must retain the final independent interpretive authority to define the scope and application of [the Minnesota Rules of Professional Conduct]." *Prod. Credit Ass'n v. Buckentin*, 410 N.W.2d 820, 823 (Minn.1987). The interpretation of court rules presents a question of law. *Huntsman v. Huntsman*, 633 N.W.2d 852, 854 (Minn.2001).

Accordingly, our standard of review is de novo.

Before addressing the interpretation of Rule 1.10(b), a brief history of *Jenson* and the rule is necessary. We decided *Jenson* in 1983 and used it to articulate the following three-part test for evaluating lawyer disqualifications:

(a) Considering the facts and the issues involved, is there a substantial, relevant relationship or overlap between the subject matters of the two representations?

(b) If so, then certain presumptions apply: First, it is presumed, irrebuttably, that the attorney received confidences from the former client and he or she will not be heard to claim otherwise. Second, it is also presumed, but subject to rebuttal, that these confidences were conveyed to the attorney's affiliates.

(c) Finally, at this stage, if reached, the court weighs the competing equities.

*Jenson*, 335 N.W.2d at 731–32 (citations omitted).

Two years after *Jenson* was decided, we issued an order enacting the Minnesota Rules of Professional Conduct and repealing the former Minnesota Code of Professional Responsibility. Minn. R. Prof. Conduct, Comments. Rule 1.10(b), the rule dealing with imputed disqualifications, was adopted in the original 1985 order and was then amended in a 1999 order from this court[3] and currently reads as follows:

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the

---

**3.** The earlier version of Rule 1.10(b) did not include any of the subparts and stated, merely, "When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests were materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter." Minn. R. Prof. Conduct 1.10(b) (1999).

lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) unless there is no reasonably apparent risk that confidential information of the previously represented client will be used with material adverse effect on that client because:

(1) any confidential information communicated to the lawyer is unlikely to be significant in the subsequent matter;

(2) the lawyer is subject to screening measures adequate to prevent disclosure of the confidential information and to prevent involvement by that lawyer in the representation; and

(3) timely and adequate notice of the screening has been provided to all affected clients.

Minn. R. Prof. Conduct 1.10(b). We must interpret this version of the rule before juxtaposing the rule as interpreted by us to the three-part test we articulated in *Jenson.*

The district court's interpretation of Rule 1.10(b) requires that whenever there is a conflict for a lawyer in a law firm, the entire firm should be disqualified unless it can be shown that there is no risk of client confidences being shared because *all* of the conditions set forth in the rule are met. These conditions are as follows:

(1) any confidential information communicated to the lawyer is unlikely to be significant in the subsequent matter;

(2) the lawyer is subject to screening measures adequate to prevent disclosure of the confidential information and to prevent involvement by that lawyer in the representation; and

(3) timely and adequate notice of the screening has been provided to all affected clients.

The court of appeals interpreted the rule to mean that disqualification can be avoided if the firm can show *either* (1) *or* (2) and (3).

■ The district court's conclusion that the three subparts of the rule are conjunctive was based on the use of " 'and' as opposed to 'or' or some other word of joinder." We agree with the district court that the language of Rule 1.10(b) is the type of language that is typically associated with a conjunctive rule. The language of the rule is also identical to the *Restatement of the Law (Third)—The Law Governing Lawyers* § 124 (2000). The comment to the *Restatement,* therefore, is helpful in interpreting the language of the rule, and the *Restatement* comment makes clear that screening only applies when the information is not likely to be significant: *Restatement* § 124, subsection (2) "removes imputation * * * when the confidential information is unlikely to be significant in the matter *and* an appropriate screen is erected." *Restatement of the Law (Third)—The Law Governing Lawyers* § 124, cmt. a (emphasis added). Moreover, the 1999 petition to amend Minn. R. Prof. Conduct 1.10 into its current form stated that "[t]he language of the amendments is intended to include the elements contained in the *Restatement.*" *In re Petition to Amend the Minnesota Rules of Professional Conduct and the Rules on Lawyers Professional Responsibility,* No. C8–84–1650, No. C1–84–2140 (Feb. 18, 1999). This reference indicates that the interpretation used in the *Restatement,* as revealed in the comment, was before our court when Rule 1.10(b) was adopted. Thus, the plain meaning of the rule indicates that the three subparts of the rule should be read conjunctively, and the history of the rule's adoption supports that interpretation.

This conjunctive interpretation establishes a three-tiered system with bright line rules for each occasion: (1) when a lawyer has not gained enough information from the prior representation to be disqualified, there is no issue of imputation to the new law firm because there is no direct disqualification; (2) when a lawyer has gained sufficient knowledge from the prior representation to be personally disqualified, yet the knowledge is not likely to be significant in the subsequent representation of an adverse party by the new firm, imputation can be avoided with adequate screening and notice; and (3) when, through prior representation, a lawyer has gained knowledge that is likely to be significant in the subsequent representation of an adverse party by her new firm, no screening can cure the conflict and disqualification is imputed to the new firm.

We recognize that a conjunctive reading of the rule does not allow a law firm to take measures to avoid an imputed conflict if the information communicated to the lawyer is likely to be significant. Under such a reading, even the most comprehensive screening measures cannot save the new law firm from disqualification in such a situation. In an attempt to mitigate this result, the court of appeals read the rule as conjunctive in part and disjunctive in part, determining that disqualification could be avoided if the firm could show that either the confidential information was not likely to be significant *or* effective screening measures were taken. This reading directly contradicts the comment to the *Restatement*, but the court of appeals reasoned that it was the only reading that gives meaning to each part of the rule. The court of appeals concluded that

if the information at issue is not likely to be significant, then screening is redundant, so allowing screening only in situations where the information being screened is not significant is nonsensical.

■ While the interpretation given to the rule by the court of appeals may have some appeal, it is also fraught with its own problems. Primarily, the court of appeals' interpretation assumes that there is no need to maintain confidentiality of information that is not likely to be significant in the subsequent legal matter. A lawyer's obligation to maintain all client confidences, significant or insignificant, under Minn. R. Prof. Conduct 1.6 is broader than the court of appeals' interpretation of Rule 1.10(b) would allow. The court of appeals' interpretation does not require a law firm to implement any screening measures when the information is not likely to be significant. Such a result is contrary to the purpose of the rule—to instill confidence in the legal profession. Allowing a law firm to hire a lawyer with confidential information on a former client whose interests are currently adverse to those of one of the firm's clients, without requiring that firm to enact screening measures simply because the information is not *likely* to be significant, creates an appearance of impropriety that is likely to lessen client confidence in the profession.[4]

Here, we are bound by the language of the rule. We are properly reluctant to interpret the rule as contradictory to its plain meaning, especially when the plain meaning is consistent with the purpose behind the rule—to instill confidence in the legal profession. Therefore, we conclude

---

4. The approach taken by the dissent is fraught with many of the same problems inherent in the approach taken by the court of appeals. Especially troubling is the dissent's marginalization of Fischer's activity on behalf of Len- nartson and the singular nature of the dissent's focus on the problems caused to Rider Bennett and its client to the near exclusion of the purpose behind the rule, which is to instill confidence in the legal profession.

that the plain language of Rule 1.10(b) requires that the subparts of the rule be read conjunctively. This interpretation requires that whenever one lawyer in a firm has a conflict, the conflict will be imputed and the entire firm will be disqualified unless the information communicated to the lawyer is unlikely to be significant in the same or a substantially related matter, appropriate screening is implemented, and notice is given to all affected clients.

## II.

As previously noted, our interpretation of Rule 1.10(b) does not necessarily end our inquiry into the issue before us. We also must address whether the three-part balancing test we established in *Jenson* conflicts with our interpretation and, if so, whether the *Jenson* test has been superceded by Minn. R. Prof. Conduct 1.10(b) in cases of imputed disqualification of lawyers in the private sector.

We have previously suggested that the *Jenson* test has been reincarnated in the rules. We described the appropriate direct disqualification analysis as "the test[ ] set forth in * * * *Jenson v. Touche Ross & Co.,* * * * as now codified in Rule 1.9 of

M.R.P.C." *Buckentin,* 410 N.W.2d at 825.[5] There is additional support for this suggestion. Since the rules were adopted in 1985, *Jenson* has been cited consistently, both by our court, as recently as 2000, and the court of appeals, as recently as 2001, in disqualification cases. *See In re Estate of Janecek,* 610 N.W.2d 638, 640 (Minn.2000) (noting that district court relied on *Jenson*); *Star Centers, Inc. v. Faegre & Benson L.L.P.,* No. C0–00–2075, 2001 WL 605088 at *4–5 (Minn.App.) (citing *Jenson* as the appropriate test for disqualification due to conflict of interest), *aff'd on other grounds,* 644 N.W.2d 72 (Minn.2002). We have, however, cited to Rule 1.10 only once. *Humphrey on Behalf of State v. McLaren,* 402 N.W.2d 535, 543 (Minn. 1987) (determining that a government legal department is not a law firm under Rule 1.10 so that a conflict of one lawyer does not disqualify the entire Attorney General's office).

There has been a dearth of citations to Rule 1.10 since its adoption almost 20 years ago, largely because the majority of disqualification cases deal with direct[6] instead of imputed disqualification, so a different rule is cited.[7] *Humphrey v.*

---

**5.** The dissent relies heavily on this language in *Buckentin* despite the fact that *Buckentin* dealt with the interpretation of a different rule—Rule 1.9 of Minn. R. Prof. Conduct, not Rule 1.10(b).

**6.** The rule on direct disqualification is Minn. R. Prof. Conduct 1.9 which reads as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the

information has become generally known.

Minn. R. Prof. Conduct 1.9.

**7.** *See, e.g., Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 868 (Minn.1989) (citing Rule 1.7, on direct disqualification of a single firm handling adverse parties in separate matters); *Buckentin,* 410 N.W.2d at 823 (citing Rule 1.9 on direct disqualification); *Faegre & Benson,* No. C0–00–2075, 2001 WL 605088 at *3 (Minn.App. June 5, 2001) (citing Rule 1.7 on direct disqualification of same firm handling parties with adverse interests), *aff'd on other grounds,* 644 N.W.2d 72 (Minn.2002); *In re Trust Created by Hill,* 499 N.W.2d 475, 491 (Minn.App.1993) (citing Rule 1.9 on direct disqualification); *Carlson v. Fredrikson & Byron, P.A.,* 475 N.W.2d 882, 889 (Minn.App. 1991) (citing Rule 1.7 on informing clients about representation of adverse interests);

*McLaren*, is, therefore, our most relevant case since *Jenson* because it is the only case discussing imputed disqualification. However, *Humphrey*'s precedential value is compromised by two significant factors: it addressed the imputation of disqualification to a government agency instead of a private law firm; and it arose before the 1999 amendment to Rule 1.10(b). Additionally, it is misleading to characterize *Humphrey* as using Rule 1.10 and *Jenson* simultaneously because in *Humphrey* we did not rely on *Jenson* in our analysis. *Humphrey*, 402 N.W.2d at 543 (stating in a parenthetical to a *Cf.* citation of *Jenson* that "this court, utilizing presumptions, adopted a flexible test for disqualification for a 'substantial relationship' between a current and prior client representation"). Therefore, this is the first time we have been asked to compare Rule 1.10(b) and the *Jenson* test to determine whether they are compatible.

We note that there are two important differences between Rule 1.10(b) and the *Jenson* test. First, Rule 1.10(b) explicitly addresses in subpart (1) whether the confidential information is significant, which in the *Jenson* test is something that would be considered, if at all, in weighing the equities. Second, Rule 1.10(b) does not give the court discretion to weigh any of the other equity considerations from *Jenson*. The *Jenson* test, unlike the rule, allows for consideration of a broader range of factors, and thereby introduces an element of greater discretion into the decision of whether to impute disqualification. These differences are significant and render the two tests difficult to reconcile. Therefore, we conclude that the *Jenson* test cannot readily act as a supplement to the rule because the differences in the two approaches can lead to different results.

Having concluded that the tests under the rule and *Jenson* cannot comfortably be read consistently in the realm of imputed disqualifications in the private sector, we must next determine which test should control. Rider Bennett urges us to conclude that *Jenson* controls or, at a minimum, allows what some states with stricter rules allow. These states have a judicial equities overlay to their rule that allows for screening even when the directly disqualified lawyer has gained knowledge that is likely to be significant in the representation of an adverse party by the lawyer's firm.[8] It is asserted that such an interpretation recognizes "the organization and structure of today's law practice with the increase in size of law firms and the mobility of lawyers among firms [and] * * * that disqualification separates the client from his chosen counsel, causes delay, and may subject both the client and the disqualified lawyer to significant economic hardship." *Jenson*, 335 N.W.2d at 731. Moreover, by allowing appropriate screening, such an interpretation would

Oxford Dev. Minnesota, Inc. v. County of Ramsey, 428 N.W.2d 434, 438–39 (Minn.App. 1988) (citing Rule 1.9 on successive representations).

Sometimes, even when the disqualification is direct, however, the court of appeals has gone directly to a *Jenson* analysis without citing any rule. *In re Estate of Janecek*, No. C2-99-1437, 2000 WL 1780250 (Minn.App. Dec.5, 2000) (discussing disqualification of the counsel for the estate's personal representative); *Golden Valley Lutheran College v. City of Golden Valley*, No. C0–91–1189, 1991 WL 263472 (Minn.App. Dec.17, 1991) (determining whether to disqualify firm that had previously represented adverse party).

8. *See, e.g., Chapman v. Chrysler Corp.*, 54 F.Supp.2d 864 (S.D.Ind.1999) (citing Indiana's rule that strictly imputes disqualification, but stating that while there is a presumption that the directly disqualified attorney's knowledge is attributed to the new firm, that presumption can be rebutted with evidence of effective screening).

mitigate the "entirely too harsh" result of the "disqualification of an entire firm for the disqualification of a single member or associate." *Id.* at 732 (citing *Kesselhaut v. United States*, 214 Ct.Cl. 124, 555 F.2d 791, 793 (1977)).

We conclude, however, that any perceived harshness inherent in our decision is alleviated by a comparison with imputed disqualification rules used by other states. Only eight states have rules that permit a law firm to avoid imputation by using proper screening when the newly associated lawyer has material information.[9] The majority of states have a rule that is facially more restrictive than our imputed disqualification rule because the rules in these states do not allow for screening at all.[10] Some of these states, however, have created a judicial equities overlay that con-

siders screening and thus has the potential to impute disqualification less frequently than would occur under our rule.[11] A survey of other states' rules indicates that while some states have rules that more strictly impute disqualification and some have rules that more liberally permit screening in virtually all situations, most states presume disqualification is imputed and permit screening to rebut that presumption only in some limited situations.

■ Our Rule 1.10(b) was adopted two years after we decided *Jenson* and was then amended fourteen years later. We conclude that our rule, unlike the rules in states that have created a judicial equities overlay, specifically articulates under what limited situations screening can rebut the presumption that disqualification is imputed. Therefore, we conclude that in the

---

9. *See* Ill. R. Prof. Conduct 1.10(b); Ky. Sup. Ct. R. 3.130; Md. R. Prof. Conduct 1.10(b); Mich. R. Prof. Conduct 1.10(b); Or. Code Prof. Resp. DR 5–105(h); Pa. R. Prof. Conduct 1.10(b); Tenn.Code Prof. Resp. DR–5–105(D); Wash. R. Prof. Conduct 1.10(b).

10. These states' rules are based upon the 1995 ABA Model Rules, which required disqualification of the firm whenever any attorney was directly conflicted without the possibility of screening. ABA Model Rule 1.9(b) (1995). Fourteen states have adopted the 1995 ABA Model Rules verbatim (Alaska, Arkansas, Colorado, Georgia, Hawaii, Idaho, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Vermont, Virginia, Wyoming) and twenty-three states and the District of Columbia have adopted rules that renumber some sections but maintain the essence of the 1995 ABA Model Rules (Alabama, Arizona, California, Connecticut, Delaware, District of Columbia, Florida, Indiana, Iowa, Kansas, Louisiana, Maine, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, North Dakota, Rhode Island, Texas, Utah, West Virginia, Wisconsin).

The 1995 ABA Model Rule 1.10(a) was amended in the 2003 edition to narrow the circumstances where an individual lawyer's disqualification would be imputed to the en-

tire law firm, and the highlighted language was added: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, *unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.*" (Emphasis added.) We recognize that the broadening of the ABA rule may lead to less facially restrictive rules in the majority of states since they relied so heavily on the 1995 version of the ABA rules in crafting their rules. Even if the rules in these states are broadened to reflect the 2003 ABA Model Rules, however, they will still be facially more restrictive than the current Minnesota rule.

11. *See, e.g., Brown v. Eighth Judicial Dist. Court ex rel. County of Clark*, 116 Nev. 1200, 14 P.3d 1266, 1269–70 (2000) (citing the strict Nevada Rule of Professional Conduct 160(2), which imputes disqualification whenever the directly conflicted lawyer previously acquired protected client information that is material to the current matter, but also noting that when considering whether to impute disqualification, a court must consider and balance the prejudices the parties will suffer as a result).

context of imputed disqualifications of lawyers in the private sector, insofar as the test we articulated in *Jenson* is inconsistent with Minn. R. Prof. Conduct 1.10(b), it has been superceded by the rule. Further, to the extent that the interpretation we give to the plain meaning of our rule may be perceived as failing to acknowledge the nature of today's law practice, we conclude that these concerns are best addressed through a comprehensive reexamination of the rule rather than review under the limited facts of this particular case.

## III.

We must now apply the rule as we have interpreted it to the facts of this case. Here, the district court found that Fischer, while employed at the Corwin firm, reviewed the entire Lennartson file in preparation for the deposition she conducted. The court also found that Fischer had received significant confidential information when she worked with Corwin. Based on this finding, any argument that the information Fischer obtained while working with the Corwin firm is not likely to be significant lacks merit. Rider Bennett represents the opposing party in the same matter in which Fischer conducted discovery. Thus, Rider Bennett is unable to meet the first subpart of the rule and therefore any screening measures it enacted are irrelevant. Disqualification of Rider Bennett is required under the rule. Therefore, we hold that the court of appeals erred when it concluded that Rider Bennett could continue to represent the school district.

Finally, because we hold that Rider Bennett is disqualified, we do not reach the issue of notice and decline to address what constitutes "timely and adequate notice" under Rule 1.10(b)(3).

Reversed and remanded.

HANSON, J., took no part in the consideration or decision of this case.

GILBERT, J., files a dissenting opinion.

GILBERT, Justice (dissenting).

I respectfully dissent from the majority opinion and would affirm the court of appeals. The majority opinion improperly uses the Minnesota Rules of Professional Conduct in its analysis; its interpretation of Rule 1.10(b) is overly broad. While the Rules of Professional Conduct have been used in prior disqualification cases, the use has been limited in scope and always has been accompanied by the application of equitable principles. The majority now eliminates our long-established test of balancing of the equities when considering whether to disqualify a law firm from continued representation. However, there is nothing in the rules or comments that would indicate that the Minnesota Rules of Professional Conduct governs our decision making to the exclusion of *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 731 (Minn.1983). In fact, in *Production Credit Ass'n v. Buckentin*, 410 N.W.2d 820, 825 (Minn.1987), we indicated that although *Jenson* may have been codified in the rule, we still used our equitable principles to apply the rule to the facts in a disqualification case.

The preamble to the Rules of Professional Conduct notes "the Rules simply provide a framework for the ethical practice of law." Minn. R. Prof. Conduct pmbl. It further provides that the "[f]ailure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process." *Id.* However, these rules are not to be used in civil proceedings for a tactical advantage sought by one party over another. In fact, the scope of the rules specifically states that:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. * * * They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantial legal duty of lawyers or the extradisciplinary consequences of violating such a duty.

*Id.*

The use of Minn. R. Prof. Conduct 1.10(b) to disqualify Rider Bennett exceeds the scope of the Rules of Professional Conduct by giving appellant standing to seek enforcement of Rule 1.10(b) in a collateral proceeding involving appellant's sexual harassment claim against respondent. The majority's decision improperly allows Rule 1.10(b) to be invoked by an adversary as a procedural weapon on the eve of trial. While the comments to the Rules are not binding on us, we have adopted those principles in our decisions. We have long held that a violation of the Rules of Professional Conduct cannot give rise to a private cause of action against an attorney, nor should it create any presumption that a legal duty has been breached, nor should the rules be used to augment extradisciplinary consequences of violating such a duty. *See L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989); *In re Proposed Petition to Recall Hatch,* 628 N.W.2d 125, 128 (Minn.2001). Here, Rule 1.10(b) has been used to augment a substantive legal duty of lawyers in a collateral proceeding.

Additionally, the scope of the rules has been ignored by the majority in another important manner. The portion of the Rules of Professional Conduct addressing the scope of the rules states the following:

The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself. Some of the Rules are imperatives, cast in the term "shall" or "shall not." These define proper conduct for purposes of professional discipline. Others, generally cast in the term "may" are permissive and define areas under the Rules in which the lawyer has professional discretion. No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of discretion.

Minn. R. Prof. Conduct pmbl.

The rule in issue uses the word "may" and thus delineates permissive conduct and defines an area in which the lawyer has professional discretion. Even assuming the appellant had standing to use these rules as a sword, no disciplinary action would result from these actions taken within the bounds of the lawyer's discretion. The specific rule in issue provides "[w]hen a lawyer becomes associated with a firm, the firm *may* not knowingly represent a person in the same or a substantially related matter in which that lawyer * * * had previously represented a client whose interests are materially adverse to that person." Minn. R. Prof. Conduct 1.10(b) (emphasis added).

The majority's use and interpretation of Minn. R. Prof. Conduct 1.10(b) violates the rule of reason contained within the scope of the rules. The majority has created a per se rule that whenever one lawyer in a firm has a conflict, that lawyer's conflict

will be imputed to the entire firm and the entire firm will be disqualified unless the information communicated to the lawyer is not significant in the same or substantially related matter, appropriate screening is implemented, and appropriate notice is given. This per se rule ignores the equitable balancing test that we have traditionally used to analyze imputed disqualification cases and has an unnecessarily harsh result. The majority's rule applied here results in the disqualification of an entire law firm that has worked on respondent's case for over 3 years just because they laterally hired a new lawyer who had performed some work on the case. In the process, respondent's interests on the eve of trial have been totally ignored by the majority's decision and there has been no weighing of competing equities.

As the majority points out, Rule 1.10(b) does identify three dependent clauses to be considered if we assume this disciplinary rule is to be used in a civil suit context. It states that the conflicted firm should be disqualified

> unless there is no reasonably apparent risk that confidential information of the previously represented client will be used with material adverse effect on that client because: (1) any confidential information communicated to the lawyer is unlikely to be significant in the subsequent matter; (2) the lawyer is subject to screening measures adequate to prevent disclosure of the confidential information and to prevent involvement by that lawyer in the representation; and (3) timely and adequate notice of the screening has been provided to all affected clients.

Minn. R. Prof. Conduct 1.10(b).

However, it is not appropriate for the majority to adopt a per se test for evaluating the implication of a disqualification of a lawyer in the private sector by relying solely on the Rules of Professional Conduct without applying the equitable balancing test that has been traditionally used in this analysis. It is true that we stated that the *Jenson* test is now codified in Minn. R. Prof. Conduct 1.9 for a lawyer's direct conflict of interest with a former client. *Production Credit Ass'n*, 410 N.W.2d at 825. However, our reasoning in *Jenson* is even more compelling in an imputed disqualification analysis where we instructed the courts to weigh the competing equities. *Jenson*, 335 N.W.2d at 732. We implemented this weighing of the equities after presuming that the attorney received confidences from the former clients and that the confidences were conveyed to the attorney's affiliates, subject to rebuttal. *Id.* at 731. It is at this last stage in the analysis where we find ourselves in this case. Here, there has been unchallenged rebuttal evidence indicating that these confidences were not conveyed by the lawyer to the new law firm.

Since the Rules of Professional Conduct were adopted in 1985, we have repeatedly cited to the *Jenson* decision, as has the court of appeals. Its equitable rationale is still viable, especially in this day and age when there appears to be more and more movement by lawyers between firms than has ever occurred in the past. The employment mobility of lawyers might be dictated in part by economics, including the consolidations and mergers of law firms and law firms going out of business and/or downsizing with lawyers then seeking professional employment with other firms. Based on the limited scope of Minn. R. Prof. Conduct 1.10(b), *Jenson* can indeed coexist with the rule. The rule may be used to help guide the balancing of the equities, but the consideration of the equities of all the parties is still not only viable but essential.

The grammatical exercise done by the majority in isolation of the facts presented ignores the governing principles set

forth in the Rules of Professional Conduct's preamble and departs with many years of practice and precedent. Indeed, the comment accompanying Rule 1.10 has a specific section entitled "Lawyers Moving Between Firms." It points out the complications associated with such mobility and states the following:

> There are several competing considerations. First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule of disqualification should not unreasonably hamper lawyers from reforming new associations and taking on new clients after having left a previous association. * * * If the concept of imputed disqualification were defined with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

Minn. R. Prof. Conduct 1.10, 1985 comment.

In *Jenson*, we recognized the "countervailing interests" in a similar lateral hire situation. In balancing the equities we focused on the "economic hardship" and "greater fairness." *Jenson*, 335 N.W.2d at 731–32.

The section of the comment entitled "Lawyers Moving Between Firms" ends with a common sense recommendation for resolving these issues in a disciplinary context. It states, "A rule based on a functional analysis is more appropriate for determining the question of vicarious disqualification. Two functions are involved: preserving confidentiality and avoiding positions adverse to a client." Minn. R. Prof. Conduct 1.10, 1985 comment. Furthermore, there is nothing in the com-

ments to indicate that the rule was either intended to eliminate the court's equitable powers or that *Jenson* had somehow been replaced or voided by this rule of disciplinary conduct. The disqualification of a lawyer or law firm, as requested by the appellant in this case, is in the nature of equitable relief. In *Jenson*, we pointed this out and stressed that competing interests must be weighed and the equities must be balanced. This is especially true where judgment and discretion are involved.

Under these facts, there does not appear to have been any reasonably apparent risk that any of the confidential information of the appellant had been or will be used for any purpose whatsoever by either the respondent or its law firm. In fact, the district court specifically found the attorney in question had not worked on the case with the new law firm and that "[n]o evidence exists that client secrets or other information has been shared by Ms. Fischer with other Rider, Bennett attorneys." This factual finding has not been challenged and has ample support in the record.

The record reflects that the law firm blocked out the laterally hired lawyer from any contact or communication relating to this file or either client. Both Fischer and the staff working under her direction were instructed that they could have no contact with the Lennartson file materials and that they must not discuss this case with any of the attorneys or staff who are engaged in the school district's defense.

Likewise, the school district's defense lawyers were instructed not to have any discussion with any staff members working under Fischer's supervision. The law firm also took steps to physically screen Fischer from the case. Case files were stored in a separate storage cabinet just outside the lead counsel's office and on the doors of this cabinet were placed prominent advi-

sories stating as follows: "AN ETHICAL WALL HAS BEEN IMPOSED ON LENNARTSON VS. ANOKA–HENNEPIN SCHOOL DISTRICT NO. 11, 10924/R21611 WITH RESPECT TO ATTORNEY SUSANNE FISCHER." A similar sticker was placed on each subfile folder. Moreover, the files were located on a different floor than Fischer's office. There was no allegation or proof that there was in fact any breach of confidentiality or collusion within the approximately 140 member Rider Bennett law firm. Accordingly, the purpose of the rule has been satisfied. "[T]here is no reasonably apparent risk that confidential information of the previously represented client will be used with material adverse effect on [appellant]." Minn. R. Prof. Conduct 1.10(b).

Finally, this underlying lawsuit has been proceeding since November of 1999. The initial lawyer representing the appellant withdrew from any further representation of the appellant. The court granted the motion of appellant's former law firm to withdraw from further representation on December 15, 2000 and reset a trial date for March 5, 2001. Then, pursuant to appellant's request, the court set a new trial date for June 1, 2001. The court also ordered sanctions against the appellant and emphasized that there would be no further continuances of this trial date.[1] Subsequent to the withdrawal of appellant's counsel and after two continuances of trial dates, Ms. Fischer was hired by Rider Bennett as an associate lawyer on March 26, 2001. If the original trial had gone ahead as scheduled on March 5, 2001, this predicament would have been avoided. The district court did exercise its equitable power to allow Ms. Fischer's law firm to withdraw from representing the appellant on the eve of trial and then further exercised its equitable powers by granting one more continuance to the appellant. Now the majority opinion will force the respondent school board to seek a new law firm after spending years preparing for trial with the assistance of the Rider Bennett law firm. The countervailing interests of the respondent school board have been totally ignored by the majority, including the significant economic hardship they will incur, as well as the further needless delays and uncertainties that will occur by forcing the board at this late date to hire replacement counsel to represent its interests. In weighing the competing interests of the respondent and the appellant and balancing the equities between the parties and in consideration of the lack of harm demonstrated in this record, in greater fairness, the Rider Bennett law firm should not be disqualified.

---

1. The respondent was granted a senior lien on any recovery by the appellant in the amount of $4,000.